### HEDRICK v. HOCKFIELD et al.

### In re HOCKFIELD.

(District Court, E. D. North Carolina.   August 24, 1922.)

### No. 410.

1. **Fraudulent conveyances ⊚278(1)—Relative, to whom insolvent debtor conveyed property, required to prove conveyance based on valuable consideration, free from intent, known to relative, to defraud creditors.**

When an insolvent debtor conveys property to near relative, and thereby places it beyond the reach of his creditors, who questioned the validity of the conveyance, the relative, to sustain title, will be required to show by satisfactory evidence that the conveyance was based on a valuable consideration, free from any intention on the part of the debtor, known to, or participated in, by the relative, to hinder, delay, or defraud his creditors.

2. **Bankruptcy ⊚181—Insolvent debtor's conveyance to daughter held fraudulent as to creditors.**

Insolvent debtor's conveyance of land less than a month before he was adjudged a bankrupt to a near relative, who paid debtor no consideration, but merely executed a note to the debtor's wife, who thereafter indorsed the note to a daughter, who thereafter indorsed the note to another relative, *held* fraudulent as to debtor's creditors, entitling trustee in bankruptcy to have deed set aside, under Bankruptcy Act, § 67e (Comp. St. § 9651).

3. **Evidence ⊚248(4)—Husband's allegations as to ownership of land, which wife and husband had alleged belonged to wife, held competent to disprove allegation.**

In action by trustee in bankruptcy to set aside bankrupt's conveyance to near relative, on the ground that it was fraudulent as to his creditors, in which the wife was joined as a party, and in which the bankrupt and his wife alleged that the land had in fact belonged to the wife, but had been conveyed to the husband by mistake, the bankrupt's declarations as to his ownership of the land, though not evidence against the wife, were competent to disprove such allegation.

4. **Bankruptcy ⊚303(1)—Wife, claiming land conveyed to bankrupt husband, had burden of proving that land was paid for with her separate estate.**

In action by trustee in bankruptcy to set aside bankrupt's conveyance to near relative, on the ground that it was fraudulent as to his creditors, in which the wife was joined as a party, and in which the bankrupt and his wife alleged that the land had in fact belonged to the wife, but had been conveyed to the husband by mistake, the burden was on the wife to show that the land was paid for with her separate estate.

5. **Husband and wife ⊚129(3)—Bankrupt's wife held estopped from asserting ownership of property of record in name of bankrupt husband.**

Where title to property stood of record in the name of the husband with the wife's knowledge and assent for 4½ years, the wife was estopped, after the husband had been adjudged a bankrupt for inability to pay creditors, from whom he had obtained credit on the strength of his ownership thereof, to assert that the land in fact belonged to her, but had been conveyed to the husband by mistake.

6. **Equity ⊚65(2), 66—Wife, permitting title to stand of record in husband's name, on which he obtains credit, cannot assert equitable ownership after bankruptcy of husband.**

Where wife permitted property, which had been conveyed to husband, to stand of record in the husband's name for 4½ years, on which he obtained credit, she cannot claim that the land had been conveyed to the

⊚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

husband, instead of the wife, by mistake, in view of the maxims that "he who asks equity must do equity," and "he who comes into a court of equity, invoking its aid, must come with clean hands."

In Equity. Bill by H. G. Hedrick, trustee of M. Hockfield, bankrupt, against Morris Hockfield and others, to set aside deed. Decree for complainant.

R. H. Sykes, of Durham, N. C., for plaintiff.
W. B. Guthrie, of Durham, N. C., for defendants.

CONNOR, District Judge. The bill, answer, and evidence disclose the following case:

On February 11, 1921, defendant M. Hockfield was adjudged a bankrupt, and on February 24, 1921, plaintiff, H. G. Hedrick, was duly elected and qualified as trustee. On January 11, 1921, said M. Hockfield, being then and for some time prior thereto insolvent, together with defendant Mary Hockfield, his wife, executed to defendant Rosie Hockfield a deed conveying to her a house and lot in the city of Durham, described therein as "being the same lot mentioned and described in the deed from W. L. Foushee to Morris Hockfield, dated July 1, 1916, and registered in the office of the register of deeds of Durham county," which was on January 11, 1921, registered in Durham county. The consideration recited in said deed was "$10 and other good and valuable considerations." At the time, and as security for the price of said lot, defendant Rosie Hockfield executed her note, due and payable in 12 months, to defendant Mary Hockfield, wife of defendant M. Hockfield, for $6,000, with interest from date, payable semiannually, and at the same time, with her husband, S. H. Hockfield, executed a deed conveying to one Guthrie, in trust to secure the payment of said note, the said lot conveyed to her by said M. Hockfield and wife. This deed was registered in Durham county on January 12, 1921. Mr. Guthrie was the attorney for all of the parties to the transaction.

On the back of the note, executed by Rosie Hockfield, is the following indorsement (typewritten):

"Pay Dora Runkel, or order, this January 11, 1921.
"[Signed] Mary Hockfield."

Dora Runkel is the daughter of defendants M. and Mary Hockfield. She resides in Cincinnati, Ohio. The note of Rosie Hockfield is in the possession of, and claimed to be owned by, Benjamin Hockfield. Rosie Hockfield resides with her husband, S. H. Hockfield, in Durham, N. C. She testified:

That she had not spoken to M. Hockfield for more than a year prior to the execution of the deed. They were unfriendly. That her husband told her that M. Hockfield's property could be bought. That she said she had but little money, but would give her note. A few days after this her husband said that Mrs. Hockfield said she would take her note. She does not know exactly what the property was worth—$7,500 or $8,000; mortgage on it for $1,500. She was to pay the note secured by mortgage. She had no other property; rents the house and lot for $50 a month; has never lived in the house; paid $10 for the deed; did not know about M. Hockfield's business; did not know that her husband was furnishing him money to live on after the fire. Dora Runkel was not in Durham at time the deed was made. Ben-

jamin Hockfield testified that he lived in Philadelphia in furniture business. That "Mrs. Dora Runkel came to Philadelphia and said she wanted $2,000. I loaned her the money on the note—gave her a check for $2,000. She indorsed on check: 'In full payment of purchase, par value, $6,000.00 note—par value. Dora Runkel.' She indorsed on note (typewritten): 'Pay Benjamin Hockfield, or order, without recourse on me. This the 16th day of April, 1921. Dora Runkel.'" Did not know that M. Hockfield was insolvent, or in bankruptcy. Check was paid. Was in Durham in 1907 and 1910. Have not seen Mr. Hockfield since 1910, until three years ago. "No one present when I bought the note, except Dora Runkel."

### S. H. Hockfield testified:

That he was the husband of Rosie Hockfield. Relations between M. Hockfield and self and family not friendly. Had not spoken for a number of years. Had litigation. He came to me some time in January; said that Mary Hockfield, his wife, owed money to her daughter, Dora Runkel, that she would like to sell the property to pay Mrs. Runkel's debt. Asked him how much she wanted for it. He said $7,500. "I said I would take it up with my wife. I spoke to my wife about it. She said that she did not have that much money, but would like to have the property; that she would give her note for $6,000, in addition to the mortgage on it, $1,500. A few days later M. Hockfield came to me and said that Mrs. Hockfield would take my wife's note, etc. The trade was on that basis. Mrs. Dora Runkel married a very wealthy man. Benjamin Hockfield had some correspondence with me about buying the note. Some time in March had a letter from him, asking me if Rosie's note was good for $6,000—was a legal note. I asked Mr. Guthrie. He said it was a legal note—safe investment. Property was worth $7,500 or $8,000. Did not tell Rosie about M. Hockfield's financial condition. Mary Hockfield is in Cincinnati sick. (Certificate of doctor was introduced stating that she was sick—nervous—unable to attend trial.) My wife has no property."

Dora Runkel was not introduced as witness, nor was her deposition taken. M. Hockfield had been residing and conducting a merchandise business in Durham 15 years. His stock was destroyed by fire November, 1920—insured. The trustee recovered from the insurance companies $14,000. His schedule in bankruptcy disclosed an indebtedness of $21,012, all of which was due prior to November, 1920. He had no personal estate, other than stock of goods, and no real estate, other than the lot conveyed to Rosie Hockfield. An indebtedness of $1,500 was secured by deed of trust on the lot held by defendant J. B. Stanley.

Plaintiff alleges that the deed to Rosie Hockfield was executed with the intention and for the purpose of defrauding the creditors of M. Hockfield, and that the transfers of the note to Dora Runkel, and by her to Benjamin Hockfield, were in furtherance of the scheme or plan devised by and between the defendants to consummate such fraud, etc. Defendants deny the material allegations, etc.

[1] Eliminating, for the present, other phases presented by the evidence, the primary and essential question to be decided is whether, upon the undisputed facts, the plaintiff has sustained his allegation of fraud. It is an elementary principle, based upon and amply vindicated by experience, that when an insolvent debtor conveys his property to a near relative, the effect of such conveyance being to place such property beyond the reach of his creditors, and the validity of such conveyance is called into question by his creditors, the court requires that such relatives, claiming to have acquired title to such property, show by satisfactory evidence that the conveyance was based upon a valuable con-

sideration, free from any intention on the part of the debtor, known to or participated in by the grantee, to hinder, delay, or defraud his creditors. In the instant case we have a conveyance made by an insolvent debtor of his entire real estate to a near relative on credit, with no other means of paying the purchase price than the property conveyed. No reason is assigned for the sale of the property, other than that Mary Hockfield owes her daughter money, which she wishes to pay. There is no proof of the existence of any such indebtedness, other than the statement of Morris Hockfield to S. H. Hockfield, nor is there any suggestion as to the amount of the alleged debt or the consideration upon which it is based. Hockfield and wife select a near relative, to whom, for more than a year, she has not spoken. The families are, it is alleged, "unfriendly." No cash is paid, but a note is executed, due in one year, payable to Mary Hockfield, wife of the debtor, Dora Runkel, residing in Cincinnati, who is not in Durham at the time, and, so far as appears, has never been there. A deed in trust is executed to secure the payment of the note. Within a month after this transaction Morris Hockfield is adjudged a bankrupt.

On April 16, 1921, if the evidence of Benjamin Hockfield, another relative of the parties, residing in Philadelphia, is to be accepted as true, Dora Runkel, the daughter, to whom the note was transferred, and who, S. H. Hockfield testifies, "married a very wealthy man in Cincinnati," goes to Philadelphia, stating she needs money, and sells the note to Benjamin Hockfield for $2,000. He says that he gave her a check, which he produces, with an indorsement, alleged to have been signed by Dora, "in full payment of purchase for $6,000 note, par value," and on the note is an indorsement, typewritten, to which the name of Dora Runkel is signed. An examination of the two signatures, both of which purport to have been made by her, discloses a striking dissimilarity. I encounter difficulty, in the absence of any testimony from her or of any witness, in finding that she signed both indorsements. There is a similarity in the handwriting of her name in the face of the check, signed by Benjamin Hockfield, and her name to the indorsement of the note. Benjamin Hockfield says that the transaction took place in Philadelphia, no other person being present; that she came to Philadelphia and sold him the note—says nothing of any correspondence between her and himself prior to her visit to Philadelphia. S. H. Hockfield says that Benjamin wrote him during the month of March, 1921, inquiring whether the note was "legal," and that he went to see Mr. Guthrie, who assured him that it was "legal" and a "safe investment." This is the only evidence offered in regard to this singular transaction. Dora Runkel who resides in Cincinnati, "the wife of a very wealthy man," is not introduced as a witness, nor is her deposition taken, nor any reason assigned for the failure to give the court the benefit of her evidence.

The contention of the defendants is based upon the unsupported testimony that although, in January, 1921, Dora Runkel, the daughter of an insolvent father, is pressing her mother for money, upon a debt alleged by Morris Hockfield to be due her, and that to pay such alleged debt Morris and his wife sell their entire real estate to Rosie Hockfield, taking her note, payable to the wife, who immediately transfers the note to Dora Runkel. So far as appears, without any necessity for doing so,

283 F.—37

she goes to Philadelphia for the purpose of selling, and sells to her kinsman, Benjamin Hockfield, the note secured by a deed of trust on property of the full value of the note for $2,000. Benjamin, according to S. H. Hockfield, a month prior thereto, had ascertained that the note was "legal" and a "safe investment." It is pertinent to inquire why Dora Runkel was not called, or her deposition taken, to explain the essentially relevant allegation that her mother owed her money, of which she demanded payment, and for which it is alleged the note was transferred to her, and why, although "the wife of a very wealthy man," she went to Philadelphia on April 16, 1921, and sold the note for one-third of its value. The obscurity which surrounds this alleged transaction is made more mysterious by a comparison of the signatures, purporting to have been made at or about the same time by Dora Runkel, on the note and on the check. In the light, or rather the obscurity, of this alleged transaction, is it not manifest that the dealing with the note was a part of the plan devised by Morris Hockfield to transfer the property by a pretended sale to Rosie Hockfield, take her note, payable to his wife, transfer it to his daughter, and have her to transfer it for a sum pretended to have been paid to Benjamin Hockfield?

Although the courts have uniformly held that, where such or similar transactions are sought to be sustained, every person connected with them, who had or could have had an opportunity to sustain the validity of the transaction, should be produced before the court for examination of the parties, only Rosie Hockfield and Benjamin are called. Neither Morris Hockfield, the debtor, Mary, his wife, to whom this note was made payable, and who transferred it to her daughter, Dora Runkel, to whom it is alleged the mother was indebted, who transferred the note to Benjamin, although each and every one of them are related by blood and marriage to each other, are called, nor their absence accounted for, otherwise than by a doctor's certificate that Mary Hockfield is suffering with nervousness in Cincinnati. Dealing with similar conditions, it was held, in Parker v. Fenwick, 147 N. C. 525, 528, 61 S. E. 378, 379, that—

"These conditions imposed upon the feme defendant the burden of showing that her husband owed her a valid debt, one for the recovery of which she could have maintained an action against him and enforced payment, and that the money was received by her in discharge of said debt."

There the court, speaking by the writer of this opinion, said:

"This is too well settled and too consistent with reason * * * to require the citation of authority."

[2] The entire transaction, as shown by the undisputed evidence, is surrounded with badges of fraud, evidencing a scheme to put the property of Morris Hockfield beyond the reach of his creditors. There is a total absence of any evidence that Hockfield, or his wife, owed his daughter a dollar. The transfer of the note to her was but one step in the scheme devised to defraud the creditors. The alleged indorsement of the note to Benjamin Hockfield was evidently resorted to after Morris Hockfield was adjudged bankrupt, to put the note in the hands of a near relative. The suggestion that Rosie Hockfield was "unfriendly"— had not spoken to her kinspeople for more than a year, thus relieving the

conduct of the parties of the suspicion which lurks in every phase of the transaction—does not impress the court as intended. Why should Morris Hockfield and his wife, when pressed by their daughter, as alleged, for money, seek an unfriendly kinswoman to purchase their property, not paying a dollar in money, but giving her note, which was, except for the property, utterly worthless; and why should Rosie be so ready to accommodate her unfriendly kinspeople by purchasing property for which she says she had no use, giving her note for its full value, after paying the mortgage indebtedness on the property? She is not out a dollar, but, unless she has turned the rent over to her kinspeople, has received $800 rent. The result of this transaction, between an insolvent debtor on the eve of bankruptcy, unless relief can be had, is to vest in Rosie Hockfield title to the lot, give to Benjamin Hockfield the purchase money and interest for one-third its amount, discharge Morris Hockfield from his debts, leaving his creditors, who, upon the undisputed evidence, sold him goods upon the faith of his repeated statements that he owned the lot, without any remedy.

But, to avoid this result, it is insisted that all of these devices, injected into the transaction, were unnecessary and useless, because in equity the lot was the property of Mary Hockfield, and neither Morris nor his creditors have or ever had any right to it, or the proceeds of its sale. This contention is based upon the fact that, on July 1, 1919, W. L. Foushee conveyed to Morris Hockfield the lot in controversy, in consideration of the conveyance to him, by Morris Hockfield and wife, Mary, a lot in Durham, which lot "was bought from Christian & Lunsford and is conveyed by deed from them dated October 20, 1907, to Mary Hockfield, duly recorded in the office of the register of deeds of Durham county"; that the negotiation with W. L. Foushee was had with Morris Hockfield, and Mary Hockfield took no part therein. In addition to the conveyance of said lot, W. L. Foushee paid $500 to Morris Hockfield. The lot in controversy was listed for taxation on the tax lists of Durham county by and in the name of Morris Hockfield for the years 1916–1920, inclusive, and in the name of Rosie Hockfield in 1921. H. G. Hedrick, trustee, paid the tax thereon for 1920. Property listed for taxation May 1st for current year—(stipulation filed). The defendants Morris and Mary Hockfield in their answer allege:

"That the deed for said lot, through clerical error, was made to Morris Hockfield; that neither of the defendants, Morris Hockfield or Mary Hockfield, can read or write the English language (other than their signatures), and they never knew or discovered said clerical error in making the title to Morris, instead of Mary, Hockfield until just a very short while before Morris Hockfield filed his petition in bankruptcy; that the original of said deed has been misplaced or lost for several years, and these defendants had no occasion to refer to the same, and they thought the title to said house and lot stood of record in the name of Mary Hockfield, rather than Morris Hockfield."

It is worthy of note that, in the stipulation containing the admissions regarding this phase of the case, there is no suggestion that Mary Hockfield paid for the lot, which was conveyed to W. L. Foushee in consideration of the conveyance by him to Morris Hockfield of the lot in controversy, or that she had any separate estate which was invested in said lot. In respect to the alleged clerical error made by the drafts-

man of the deed, whereby it was conveyed to Morris Hockfield, no evidence was introduced to sustain the allegation. Mr. Foushee, who presumably drew the deed which he executed, is a lawyer of learning and large practice, residing in Durham, now and at the date of the hearing. In respect to the averment of ignorance on the part of Morris Hockfield that the deed was made to him, he does not so testify, nor does his wife. His failure to do so may be explained by the fact that, on February 8, 1918, upon the call of Strauss Bros. & Co., Inc., for a financial statement as a basis for credit, he signed and sent·them a statement containing among other items, "Real estate in the name of M. Hockfield, valued at $3,000." In the statement that the real estate was in name of "M. Hockfield," his name is written by him.

Mr. Wright, president of Augustus Wright & Co., who sold goods and loaned money to Morris Hockfield, testified that Hockfield stated to him in 1920 that "his affairs were in good shape, owned property. We extended him credit—loaned cash. Said he owned his home. He claimed to own the real estate in Durham worth $3,000. W. T. Clements, president of Merchants' Bank of Durham, testified that Morris Hockfield stated to him that he owned real estate and $35,000 stock; knew his wife; she clerked in husband's store; passed store daily. Leon Wallenstein, of Richmond, testified that Morris Hockfield sent statement of February 8, 1918. Each of these witnesses extended credit to Hockfield and he is now indebted to them.

[3, 4] The declarations of Morris Hockfield are not evidence against Mary, but, as they join in the answer respecting a transaction to which they were joint parties, his representations are competent to contradict his contention, and, as she fails to testify in respect to the transaction, their averment is without support. His declarations, contradictory to their joint allegation that they did not know, until he filed his petition in bankruptcy, that the deed was made to him, are clearly competent. The burden is upon Mary Hockfield to show that the lot conveyed to Mr. Foushee was paid for with her separate estate. In Seitz v. Mitchell, 94 U. S. 580, 24 L. Ed. 179, it is held that:

"Purchases of real or personal property, made during coverture by the wife of an insolvent debtor, are justly regarded with suspicion. She cannot prevail in contests between his creditors and her, involving their right to subject property so acquired to the payment of his debts, unless the presumption that it was not paid for out of her separate estate be overcome by affirmative proof."

Citing authority, Mr. Justice Strong says:

"In the case of a purchase after marriage, the burden is upon the wife to prove distinctly that she paid for it ⁎ ⁎ ⁎ with funds which were not furnished by the husband. In Keeny v. Good, 21 Penn. St. 349, where the contest was between a wife and her husband's creditors, it was ruled that mere evidence that she purchased the property during the coverture is not sufficient to give her title; that it must satisfactorily be shown that the property was paid for with her own separate funds; and that, in the absence of such evidence, the presumption is a violent one, that the husband furnished the means of payment."

The learned justice notes that the decisions cited were made after the enactment of statutes giving to married women rights of property as against the husband and his creditors. It is not questioned that, if

shown that the lot conveyed to Mr. Foushee was paid for by the wife out of her separate property or earnings received by her with the consent of her husband when solvent, as between them a resulting trust in her favor would be enforced against her husband. Here there is a total absence of any such allegation or evidence. The admission filed by the parties not only does not make any such suggestion, but rebuts it, by the carefully guarded language and the admission that the trade for the property in controversy was negotiated by the husband alone, and the cash payment was made to him. There is no proof that she engaged in any occupation or business on her own account or received from any source any money or property. It is, in the absence of any evidence, inconceivable, in view of the facts and conditions disclosed in the evidence, that any mistake was made by the intelligent lawyer who conveyed the property, or that he made any clerical or other mistake in making the deed to M. Hockfield.

The case then comes to this: The deed was, with the consent of all parties, made to M. Hockfield. He listed the property for taxation, represented as a basis for credit, that it was his property, and when overtaken by bankruptcy resorts to a fraudulent scheme to make a pretended sale of the property on credit; has the note made payable to his wife, who immediately transferred the note to her daughter, upon a pretense that she owes her some indefinite sum of money, of which there is not a scintilla of evidence. The daughter makes a pretended sale of the note to another kinswoman for one-third of its value. It is manifest that, if the parties had advised the learned attorney who drew the deed and took the trust deed that the property had been bought and paid for with the property of the wife, he would have advised them to recite the facts and convey the property directly to the wife. If, as is evident, the deed was made to M. Hockfield with the consent of the wife, and she has for five years permitted him to hold the title, list it for taxation, and obtain credit upon repeated representations that it was his property, she is now estopped from invoking the aid of a court of equity to translate her conduct into a fraud upon his creditors by decreeing the title as against them in her.

In Goldberg v. Parker, 87 Conn. 99, 87 Atl. 555, 46 L. R. A. (N. S.) 1097, Ann. Cas. 1914C, 1059, it was held that:

"A woman who permits her real estate to stand in the name of her husband for many years, until he is accepted as a surety, to release an attachment of property of a corporation in which he is interested, upon the faith of the record title and his assertion of ownership of the property, is estopped to assert her title against the right of the creditor, although she was guilty of no fraud in the transaction."

With the change in names, the language quoted with approval by the court in the Goldberg Case from Hauk v. Von Ingen, 97 Ill. App. 642, Id., 196 Ill. 20, 63 N. E. 705, appropriately describes the condition disclosed upon this record.

[5] With the knowledge and assent of Mrs. Hockfield, the title to this property stood of record from July, 1916, to January 11, 1921, in the name of her husband. During this period he purchased from creditors the goods for which they have proven their debts in the bankruptcy proceedings. Upon the strength of his apparent ownership of such

property he obtained credit. It is neither just nor equitable that she should now, as against these creditors, be permitted to assert that this property all the while belonged to her (citing numerous authorities). The enforcement of this rule does not depend upon whether there was actual fraud, although this element is often present, but upon the inequity of the wife holding out to the world her husband's ownership, and then denying it, to the prejudice of one who has extended credit upon the faith of her act.

To permit the claim now, resorted to as a last resort, when the fraudulent scheme to place the property and the purchase price beyond the reach of the just claims of the husband's creditors has failed to prevail, would be to nullify in an essential respect the public policy and plain provisions of our registration laws. As said by the court in the Goldberg Case:

"The maintenance of our system of registry of titles is of the greatest public importance, and he who acts in reliance upon the record has behind him, not only the natural equities of his position, but also the especial equity arising from the protection afforded every one who trusts the record."

Under similar conditions it is said in Humes v. Scruggs, 94 U. S. 22, 27 (24 L. Ed. 251):

When the money of a married woman "is applied to the purchase of real estate for his advantage, or for the purpose of giving him credit in his business, and is thus used for a series of years, there being no specific agreement, when the same is purchased, that such real estate shall be the property of the wife, the same becomes the property of the husband, for the purpose of paying his debts. He cannot retain it until bankruptcy occurs, and then convey it to his wife. Such conveyance is in fraud of the just claims of the creditors of the husband."

I am not impressed with the allegation made in the answer that M. Hockfield or his wife "cannot read or write the English language" (other than write their signatures), of which no proof was offered. The "statement," made by M. Hockfield as a basis for credit, is signed by him, and his name, in the same handwriting, is written in the appropriate place, indicating that he read the printed matter. The evidence discloses that Hockfield has resided in this country 20 years and in Durham 15 years; that he is about 49 years of age; that his wife had also been in business in Durham, and has also clerked for her husband. She signed her name to the transfer of the note. Neither of them appeared before the court. It is alleged in the answer that the original deed to Hockfield has been lost. Although recorded, no copy was introduced. There is no evidence respecting the recited consideration.

The courts of this state have carefully, and with increasing anxiety, protected and conceded the rights of married women, whose separate estate has been used or invested in property by the husband, and the Legislature has by a system of legislation been in sympathetic accord with the courts. The income from their separate estate, their earnings, damages sustained by torts, etc., are secured to them. Their capacity to contract has been secured to them. The ancient fiction that they live and act under the coercion of their husbands has been abolished as "a relic of barbarism." Giving ample assent and full force and effect to this modern conception of the status of married women, certainly they

should be subjected to those principles and rules of law based upon sound morality and justice, prescribed for the prevention of fraud and injustice.

[6] It is not very material whether the effort to sustain the transactions disclosed in this case may be prevented by saying that Mary Hockfield is estopped to assert that she is the equitable owner of the lot in controversy, and therefore had the right to take the note given by Rosie Hockfield and give it to her daughter without any consideration, thus depriving the creditors of husband of property which she had permitted him to represent as his property, or whether she is met with those maxims of equity, based upon experience and expressing principles of common honesty and elemental justice, "that he who asks equity must do equity," and that "he who comes into a court of equity, invoking its aid, must come with clean hands." She would have no standing in a court of law, but in this court her equitable claims may be examined, and, if meritorious, administered, subject, however, to the well-settled principles of equity, as expressed in the maxims quoted. From any viewpoint she is not entitled to invoke the aid of this court, so as to defeat the claims of creditors of her husband.

I am of the opinion that the conveyance made by M. Hockfield and wife to Rosie Hockfield, the transfer of the note to Dora Runkel, and the alleged transfer by her to Benjamin Hockfield, constitute a series of contrivances to defraud the creditors of M. Hockfield, and that it is voidable at the suit of the trustee in bankruptcy. The cause comes within the provisions of section 67e of the Bankruptcy Act (Comp. St. § 9651), which provides "that all conveyances, transfers, assignments, or incumbrances of his property, or any part thereof, made or given by a person adjudged a bankrupt under the provisions of this act * * * within four months prior to the filing of the petition, with the intent and purpose on his part to hinder, delay, or defraud his creditors, or any of them, shall be null and void as against the creditors of such debtor," and that neither Rosie Hockfield, Dora Runkel, nor Benjamin Hockfield come within the exception which saves such conveyances and transfers to "purchasers in good faith and for a present fair consideration." Benjamin Hockfield is not a party defendant to this suit. The decree vacating and setting aside the deed to Rosie Hockfield will not bar him from asserting, in such way as he may be advised, such claim as he may make to the proceeds of the property when sold by the trustee.

This court is given jurisdiction to hear and determine a suit by the trustee to recover such property. A decree will be signed in accordance with this opinion. Plaintiff will recover his cost. If so advised, a reference will be had for an accounting by Rosie Hockfield of the rents and profits received by her from the lot in controversy.