240 F.2d 498
 AUTREY BROTHERS, Inc., Lewis Autrey, Stella Autrey and Sleep
E-Z Mattress Co., a Corporation, Appellants,
v.
Frank M. CHICHESTER, as Trustee in Bankruptcy for the Estate
of Veraco, Inc., Doing Business as Airest Mattress
Co., Bankrupt, Appellee.
 No. 15093.
 United States Court of Appeals Ninth Circuit.
 Jan. 18, 1957.
 
 Bertram H. Ross, Los Angeles, Cal., for appellant.
 Craig, Weller & Laugharn, Thomas S. Tobin, Buchalter, Nember & Fields, Los Angeles, Cal. (Frank C. Weller, Hubert F. Laugharn, C.E.H. McDonnell, Thomas S. Tobin, Murray M. Fields, Los Angeles, Cal., of counsel), for appellee.
 Before LEMMON, FEE and BARNES, Circuit Judges.
 LEMMON, Circuit Judge.
 
 
 1
 We have frequently adverted to the well-established principle that 'courts of bankruptcy are essentially courts of equity.'
 
 
 2
 Judged in accordance with an equitable norm, the individual and corporate manipulations of the appellants herein with reference to the bankrupt's property, are such as to offend the conscience of a discerning chancellor.
 
 
 3
 Within the spatial compass of a judicial opinion, it is impossible to trace the appellants' machinations in detail. We will content ourselves herein in sketching merely the barest outline of the fraudulent scheme.
 
 1. Statement of the Case
 
 4
 The Court below found that by reason of the appellants' transfers of the bankrupt corporation's assets from one corporation to another, the bankrupt's creditors were hindered, delayed, defrauded, and damaged in the sum of $76,315.62, and that by reason of the fraud practiced upon the bankrupt's creditors, the appellee was entitled to exemplary damages in the sum of $10,000.
 
 
 5
 From a judgment of $86,315.62 in favor of the appellee, the present appeal has been taken.
 
 2. Statement of Facts
 
 6
 On August 10, 1954, Veraco, Inc., doing business as Airest Mattress Co., filed a voluntary petition in bankruptcy, and on the same date was adjudicated a bankrupt. The appellee, who had been duly elected trustee, ascertained that in November, 1953, the bankrupt had transferred certain of its retail stores in California, Utah, Oregon, and Washington to the appellant Autrey Brothers, Inc., a California Corporation. It was stipulated that so far as the transfers of these stores were concerned, there was no compliance with the bulk sales laws of the respective states involved.
 
 
 7
 In a complaint filed by the appellee, it was alleged that the Times-Mirror Company of Los Angeles was an existing creditor of the bankrupt as of the date of the alleged transfers as well as at the date of the adjudication in bankruptcy.
 
 
 8
 The first four causes of action constituted separate statements of the individual transfers made in violation of the bulk sales statutes of the respective states involved. The fifth cause of action alleged that the first four types of transfer rendered the bankrupt insolvent. The sixth cause of action averred that the transfers were 'extorted by the (appellants) Lewis Autrey and Autrey Bros., Inc., with the intent and purpose on their part that the creditors, both existing and future, of (the bankrupt) should be hindered, delayed or defrauded,' etc.
 
 
 9
 On the sixth cause of action, judgment for $76,315.62 was asked. It was this amount, as we have seen, that the Court awarded as actual damages.
 
 
 10
 The present suit was filed on October 18, 1954. On November 8, 1954, the appellant Lewis ('Buster') Autrey, hereinafter Lewis, sold his 4,000 shares of stock in the appellant Autrey Brothers, Inc., to his brother, E. T. Autrey. Lewis's wife, the appellant Stella Autrey, hereinafter Stella, also sold her stock, amounting to 999 shares, at the same time to E. T. Autrey. The remaining single share of stock in Autrey Brothers, Inc., was held by Robert Willey, an employee of the company with the title of vice president. Vernon W. Autrey, hereinafter Vernon, another brother of Lewis, was the 'moving head' of the bankrupt, with the title of president.
 
 
 11
 The dubious methods used in conducting the business of the bankrupt were adumbrated in Vernon's surprising reply to the second question addressed to him on his direct examination:
 
 
 12
 'Q. Were you an officer of the bankrupt corporation, Veraco, Inc.?
 
 
 13
 'The Witness: I would like to refuse to answer any questions today on the grounds that it might incriminate or degrade me in certain matters of different things, and until I have advice from my attorney and have him present.'
 
 
 14
 On March 2, 1955, the appellee filed an 'amended and supplemental complaint', joining Sleep E-Z Mattress Co., hereafter Sleep E-Z, as an additional party defendant. It was alleged that Sleep E-Z was incorporated by Autrey Brothers, Inc., Lewis, and Stella, after the original action had been filed in the Court below, and was wholly owned and controlled by the incorporators.
 
 
 15
 The amended complaint recited that Lewis had been subpoenaed to give his deposition on December 15, 1954; that at the appellants' request, the taking of the deposition was continued to December 22, 1954; that on the latter date, the deposition was partially taken and was adjourned to January 6, 1955, for the purpose of giving Lewis an opportunity to produce certain records; that during the recess, Autrey Brothers, Inc., Lewis and Stella caused a transfer to be made to Sleep E-Z of all of the retail stores set forth in the original complaint entirely without consideration, with intent to hinder, delay, or defraud the bankrupt's creditors; and that such transfer was made on or about January 1, 1955, pursuant to a conspiracy, etc.
 
 
 16
 The deposition referred to in the amended complaint was never signed.
 
 
 17
 Much is said in the briefs regarding the alleged violations of the bulk sales laws of the various states in which the transfers were made, and as to whether the Times-Mirror was a 'creditor' at the times when such violations occurred. The appellants argue that 'subsequent creditors are not protected by the bulk sales statutes.'
 
 
 18
 The appellants have conceded, however, as they must, that 'if counsel can establish the question of actual fraud, as contrasted with a failure to comply with Section 3440 (of the Civil Code of California) and other bulk sales laws, then subsequent creditors are protected, * * *.' See 11 U.S.C.A. § 107, sub. d(2)(d), infra.
 
 
 19
 We advert therefore to the question of whether the existence of 'actual fraud' has been established in the instant case.
 
 
 20
 3. The Unsigned Deposition of Lewis Is Admissible Against Him Since It Embodies Admissions by a Party to the Litigation.
 
 
 21
 Despite the fact that they had been sued for more than $85,000, neither Lewis nor Stella, either individually or as officers and directors of Autrey Brothers, Inc., and Sleep E-Z, appeared at the trial below. As we have seen, however, Lewis did testify by deposition, which has been sent up as an exhibit. The appellants themselves request us to examine the deposition, while at the same time asserting that 'the trial court erred in receiving (it) in evidence'. The appellants further state 'that the Court will find nothing in the improperly admitted deposition to ground a finding of actual fraud'.
 
 
 22
 We disagree with the appellants in both contentions, namely, (1) that the deposition was improperly admitted; and (2) that it does not contain evidence of actual fraud.
 
 
 23
 At the moment, we inquire into the admissibility of the deposition.
 
 
 24
 Louis Sommers, who, as notary public, administered the oath to Lewis and, as certified court reporter, took down Lewis's testimony in shorthand, testified that the deposition was transcribed under his direction, and that, to the best of his knowledge, the transcript was 'true and correct'.
 
 
 25
 Under the circumstances, the incomplete deposition is admissible against Lewis as an admission.
 
 
 26
 In Sampsell v. Anches, 9 Cir., 1939, 108 F.2d 945, 955, the late Senior Judge Wilbur said:
 
 
 27
 'Two other points relied upon by appellant will be briefly mentioned. Under point 25 in his brief appellant contends that the court erred in sustaining appellees' objection to the introduction in evidence of the transcript of the testimony of appellee N. Anches, taken under § 21, sub. a of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a. The trial court ruled the evidence out upon the ground that it was in the nature of a deposition and if the witness could be produced in court at the trial, the testimony offered could not be used. This was error. Even if we assume that the proceeding under which the testimony was taken was in the nature of a deposition it was clearly admissible as an admission of a party against interest. As such, it was immaterial whether or not the witness was able to testify or had testified in the action in which he was a party. (Many cases cited.) Another ground relied upon by the trial court in excluding that evidence was that the transcript consisted of a bound book containing the testimony of other witnesses which, under Washington statutory law * * * might be taken by the jury to the jury room. All that was offered in evidence was the testimony of N. Anches which counsel offered to read. This was the proper way to adduce the evidence. The evidence consisted of statements of the witness concerning the circumstances under which he made his purchases from the bankrupt. It tended to show that the purchases were not made in good faith and thus was pertinent to the issues in the case.'[1]
 
 
 28
 We hold that Lewis's unsigned deposition was properly received in evidence as an admission by a party to the litigation.
 
 
 29
 4. There Is Substantial Evidence to Support the Trial Court's Finding That the Appellants' Transfers of the Bankrupt's Assets Defrauded Creditors.
 
 
 30
 The District Court found that 'by reason of the actions of the (appellants) herein in transferring assets of the bankrupt corporation from one corporation to another, owned and controlled by the (appellants) herein, creditors of (the bankrupt) were hindered, delayed, defrauded and damaged,' etc.
 
 
 31
 Section 107, subd. (2)(d) of 11 U.S.C.A. reads in part as follows:
 
 
 32
 '(2) Every transfer made and every obligation incurred by a debtor within one year prior to the filing of a petition initiating a proceeding under this title by or against him is fraudulent * * * (d) as to then existing and future creditors, if made or incurred with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either existing or future creditors.'
 
 
 33
 A careful study of the record in this case convinces us that the appellants practiced actual fraud upon the bankrupt's creditors in transferring the bankrupt's 'retail outlets' to Autrey Brothers, Inc.
 
 
 34
 A suspicious shadow of vagueness is thrown upon Lewis's testimony early in his deposition. Asked for the meaning of the following paragraph in the 'Memorandum Agreement' of November 5, 1953, transferring three California stores and a Salt Lake City store from Vernon to Lewis:
 
 
 35
 'Wherever the name Vernon Autrey appears herein the name of Veraco, Inc., is likewise included.'
 
 Lewis answered:
 
 36
 'A. Well, to me it meant one thing. He said he was a corporation. I say he wasn't, and he wanted it put in Veraco, and I didn't approve of it, because I did business with Vernon Autrey.'
 
 
 37
 Yet Lewis signed the agreement.
 
 
 38
 The courts have more than once adverted to the frauds that may be perpetrated under the cloak of a one-man corporation.
 
 
 39
 In affirming the judgment of the District Court, the Supreme Court, in Pepper v. Litton, 1939, 308 U.S. 295, 313, note 28, 60 S.Ct. 238, 248, 84 L.Ed. 281, quoted the following language of the District Judge:
 
 
 40
 "An examination of the facts disclosed here shows the history of a deliberate and carefully planned attempt on the part of Scott Litton and Dixie Splint Coal Company to avoid the payment of a just debt. I speak of Litton and Dixie Splint Coal Company because they are in reality the same. In all the experience of the law, there has never been a more prolific breeder of fraud than the one-man corporation. It is a favorite device for the escape of personal liability. This case illustrates another frequent use of this fiction of corporate entity, whereby the owner of the corporation, through his complete control over it, undertakes to gather to himself all of its assets to the exclusion of its creditors."
 
 
 41
 And on the possibility of fraud that lurks 'when an insolvent debtor conveys his property to a near relative, the effect of such conveyance being to place such property beyond the reach of his creditors', see Hedrick v. Hockfield, D.C.N.C.1922, 283 F. 574, 576.
 
 
 42
 With reference to the circumstances under which the agreement of November 5, 1953, was entered into, Lewis testified:
 
 
 43
 'I had been told by Vernon's employees that he was selling my merchandise; taking the money and flying all over the country chasing with women, giving bonuses to employees, and I wasn't being paid for merchandise, and the result of that meeting that evening was to try to iron out the difficulties. * * * The only way I could see to get something ironed out was just to withdraw my merchandise and have no more dealings with him.'
 
 
 44
 Lewis threatened Vernon with criminal prosecution:
 
 
 45
 'I did mention if he didn't put the money in the bank that I should have him arrested, but being a brother, nobody wants to do that, you know.'
 
 
 46
 It was after Lewis mentioned the possibility of having Vernon arrested for not putting the money into the bank that the agreement of November 5, 1953, was drawn up.
 
 
 47
 Referring to an agreement of November 16, 1953, whereby two stores in Washington and one in Oregon were transferred by Vernon to Lewis, the latter at first stated that he didn't 'believe' that he had agreed to pay all bills for advertising, current taxes, etc., but was finally forced to admit that he had so agreed.
 
 
 48
 After repeating that he 'did business with Vernon' and that 'I know nothing about Veraco (the bankrupt)' he finally admitted that he first learned 'of the existence of Veraco, Inc.' as far back as 1949!
 
 
 49
 It is only by reading the deposition itself that one can get the full flavor of Lewis' barefaced contradictions.
 
 
 50
 Since certain parts of Lewis's testimony indicate that he is a man of some intelligence, his confusion in certain other portions strengthens one's suspicions regarding his good faith.
 
 
 51
 Questioned regarding the transfer of a store, apparently situated in the State of Washington, Lewis was asked:
 
 
 52
 '* * * did you demand or receive from (the bankrupt) or Vernon * * * its president, vice president, secretary, treasurer or managing agent a statement in writing under oath giving the names and addresses of all the creditors?' etc.
 
 
 53
 This was a question that any business man of ordinary intelligence could easily answer yes or no. After some delay, Lewis managed the following reply:
 
 
 54
 'I don't know. I got something, but I don't know what.'
 
 
 55
 Regarding a store in Tacoma, one in Seattle, and one in Portland, the following cryptic testimony was given by Lewis:
 
 
 56
 'Q. And after we started taking your deposition you made a transfer of those three stores to a corporation? A. That is correct.
 
 
 57
 'Q. Known as Sleep E-Z Mattress? A. Incorporated.
 
 
 58
 'Q. Yes. When was Sleep E-Z Mattress incorporated? A. About two months ago.
 
 
 59
 'Q. Since this lawsuit was started? A. October of 1954.
 
 
 60
 Q. And that was after you had been sued in this proceeding? A. I don't know what date you sued. It probably is or isn't. It doesn't make any difference to me.'
 
 
 61
 Lewis admitted that in November, 1954, Sleep E-Z owned no assets of any description. He was the president of Sleep E-Z, and his wife Stella was secretary-treasurer. Lewis admitted that on January 1, 1955, after the taking of the deposition had commenced, the Washington and Oregon stores had been transferred by him to E-Z Mattress.
 
 
 62
 Regarding the 'consignment agreement' Lewis testified:
 
 
 63
 'You see, Vernon was in partners, as I understand it, with E. T. Autrey and Sleep-O-Pedic Company at 6500 South Broadway. They were in my opinion and in Vernon's opinion and in Gene's opinion being sued, being attached, and anything that they had in their possession would be attached, and I has knowledge of that and Vernon had knowledge of that and Gene had knowledge of that, and that is one of the main reasons that anything I put in Vernon's stores I had my consignment agreement on, because I couldn't take a chance on whether his partner was going broke or whether Vernon was going broke, so therefore I put the merchandise on consignment to protect myself.'
 
 
 64
 Reminded that at the previous session of the taking of the deposition he had been requested to produce any 'consignment agreement' that (he) had with Veraco, Inc., or with Vernon Autrey,' Lewis answered:
 
 
 65
 'I had a verbal agreement with them, but I had no written agreement.'
 
 
 66
 Lewis further testified that his wife Stella was also present when the oral agreement was made. He admitted that there was no way that any one could know that he was retaining title to the merchandise in those stores, 'Other than my brother and my wife and myself, except that I probably told a few people.'
 
 
 67
 In short, the appellant E-Z Mattress Co., of which Lewis was the president, and his wife Stella was the secretary-treasurer, had no assets at all until, on January 1, 1955, the three stores just mentioned were transferred to it. It requires no great sophistication to see that the Autreys dumped the property that the appellee trustee was seeking, from the appellant Autrey Bros., Inc., to the appellant Sleep E-Z Mattress Co.
 
 
 68
 Nor was the appellant Stella the innocent bystander that counsel contends she was. She was a stockholder in the appellant Autrey Brothers, Inc. After this suit was commenced, her stock was sold to E. T. Autrey, and Stella became secretary-treasurer of Sleep E-Z, which then became the transferee of 'all of the stores' that Lewis had. She was present when the 'verbal agreement' of consignment was made, and was one of the few persons who knew that Lewis was retaining title to the merchandise in those stores.
 
 
 69
 Vernon himself testified that Lewis threatened him with criminal prosecution unless he transferred four stores to Autrey Brothers, Inc. This threat was made on November 5, 1953, in connection with the transfer of the three California stores and the Salt Lake City store. Vernon testified that he had 'heard three or four times' that the amount that he was 'supposed to have misappropriated that belonged to Autrey Brothers' ranged from $50,000 to $200,000.
 
 
 70
 According to Vernon, these threats 'certainly' frightened him, and as a result of the conversation that he had with Lewis and his attorneys, he made the transfer of the four stores. He valued the merchandise in those four stores at $40,000 or $45,000.
 
 
 71
 Under the agreement of November 5, 1953, Vernon was to pay $7,000 a week, 'which I couldn't pay,' Vernon said on the stand. His testimony continued:
 
 
 72
 'We relinquished the other three stores to keep from having to meet the $7,000 payment each week.'
 
 
 73
 By 'the other three stores', Vernon meant the ones in Portland, Seattle, and Tacoma.
 
 5. Conclusion
 
 74
 The brief summary that we have given of the manipulations of the Autreys and their pendente lite corporation discloses, we think, a family scheme to hinder, delay, or defraud the creditors of the bankrupt.
 
 
 75
 At the very least, we cannot characterize as 'clearly erroneous' the trial court's finding 'that by reason of the actions of the (appellants) herein in transferring assets of the bankrupt corporation from one corporation to another, owned and controlled by the (appellants) herein, creditors of Veraco, Inc., were hindered, delayed, defrauded and damaged'.
 
 
 76
 Accordingly, the judgment of the District Court is affirmed.
 
 
 
 [1]
 See also Joong Sui Noon v. United States, 8 Cir., 1935, 76 F.2d 249, 251; Wigmore on Evidence, Third Edition, 1940, Volume IV, § 1048, pages 2-4; id., § 1053, page 12; 31 C.J.S., Evidence, §§ 270-272(a), pp. 1022-1024; 20 Am.Jur., Evidence, § 547, page 462