[S. F. No. 12161. In Bank.—August 27, 1926.]

ADOLPH UHL, Petitioner, v. JOHN B. BADARACCO et al., as Supervisors, and JAMES ROLPH, Jr., as Mayor of the City and County of San Francisco, Respondents.

[1] MUNICIPAL CORPORATIONS — PUBLIC UTILITIES — SAN FRANCISCO CHARTER.—Under the charter of the city and county of San Francisco, a public utility can be acquired only in one of two ways:

First, from funds derived from taxes levied for that purpose, second, from funds derived from the sale of bonds issued for such purposes, and Congress has no power to create or force a public utility upon said city.

[2] ID.—WATER BONDS OF 1910 — PURPOSE OF — POWER SYSTEM.—As the bonds issued by the city and county of San Francisco in 1910 for the acquisition, construction and completion of a water supply and works, to be owned and controlled by the city, were voted for a single public utility, namely, a "water supply and works," and no proposition was ever submitted to the taxpayer for a distinct power system, except in so far as such a system might be included in the term "works," the power plant constructed by said city is not an independent utility, but is an element of the water project only.

[3] ID.—PROCEEDS OF POWER PLANT—USE OF.—As the power plant constructed by the city and county of San Francisco is included in the acquisition of its water utility, the proceeds of the power plant must be used in the manner prescribed by the charter, as they are earnings of the utility voted for.

[4] ID.—PUBLIC UTILITIES—SURPLUS EARNINGS—DISPOSITION OF—SAN FRANCISCO CHARTER.—The contention that article XII, section 12, of the San Francisco charter, providing for the purposes for which the surplus earnings of a public utility are to be used, is applicable only where all of the interest and sinking fund requirements of the bonds issued for the utility can be made out of the surplus earnings and is inapplicable when such earnings are sufficient to pay a part only of the sum required for such purposes, cannot be maintained, as said charter makes no express distinction between the earnings derived from the utility whether completed or not and no implication in this particular can be drawn from said provision, and such construction would be unreasonable and nullify the plain intent of the statute.

[5] ID.—ARTICLE XII, SECTION 16, OF SAN FRANCISCO CHARTER —USE OF WORD "MAY."—The use of the word "may" in article XII, section 16, of the San Francisco charter, does not give the supervisors a discretion in the application of the use of the surplus funds of a public utility, but said word must be construed as meaning "must"; nor does the use of said word give the supervisors a discretion over the order in which the appropriations therein authorized may be made.

[6] ID.—DEFINITION OF POWERS—STATUTORY CONSTRUCTION.—Language defining the powers of municipal corporations and grants thereto are to be strictly construed and any fair, reasonable doubt con-

5.  See 23 Cal. Jur. 738.
6.  See 18 Cal. Jur. 801.

cerning the existence of a power is to be resolved against the corporation.

[7] ID.—TAX PROCEEDINGS — STRICT CONSTRUCTION.—As tax proceedings are *in invitum*, laws pertaining thereto are to be strictly construed in favor of the taxpayer and against the taxing power.

[8] ID.—WORDS AND PHRASES—STATUTORY CONSTRUCTION.—Where persons or the public have an interest in having an act done by a. public body, "may" in a statute means "must," and words permissive in form, when a public duty is involved, are considered as mandatory.

[9] ID.—STATUTE SUSCEPTIBLE TO TWO CONSTRUCTIONS—RULE.—Where the language of a statute is susceptible to two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another would be productive of absurd consequences, the former construction will be adopted.

[10] ID.—FUNDS FOR PARTICULAR PURPOSE—POLICY OF LAW—BONDS. It is the policy of the law, in the absence of a clear negatived intention, to have the funds authorized for a particular purpose expended for such purpose; and bonds issued must correspond and be used for the purpose for which they were issued.

[11] ID. — SAN FRANCISCO CHARTER — SURPLUS EARNINGS OF PUBLIC UTILITY—POWER PLANT — EXTENSION.—There is no authority in the supervisors and mayor of San Francisco to expend moneys received from the power plants on the Hetch Hetchy project for the acquisition or construction of a transmission line and step-down station for carrying the electric energy generated by its plant to that city until after the interest and sinking fund requirements of the bonds have been provided for.

---

(1) 28 Cyc., p. 286, n. 31 New, p. 1564, n. 8 New.   (2) 28 Cyc., p. 1564, n. 8 New.   (3) 28 Cyc., p. 1564, n. 8 New.   (4) 28 Cyc., p. 1564, n. 8 New.   (5) 28 Cyc., p. 154, n. 25, p. 1564, n. 8 New; 36 Cyc., p. 1151, n. 49.   (6) 28 Cyc., p. 265, n. 11, p. 266, n. 14 New.   (7) 36 Cyc., p. 1189, n. 75.   (8) 36 Cyc., p. 1159, n. 19, 20, 21, p. 1160, n. 35, p. 1161, n. 36, 37.   (9) 36 Cyc., p. 1111, n. 58, 69, 71, p. 1112, n. 72, 76.   (10) 28 Cyc., p. 1563, n. 3, p. 1598, n. 50. (11) 28 Cyc., p. 1564, n. 8 New.

APPLICATION for a Writ of Mandate to require the respondents to appropriate certain hydro-electric power revenues to meet interest and sinking fund payments on

---

7.   See 23 Cal. Jur. 805; 25 R. C. L. 1092.
8.   See 23 Cal. Jur. 614; 25 R. C. L. 767.
9.   See 23 Cal. Jur. 766; 25 R. C. L. 1019.

outstanding bonds of the Hetch Hetchy project. ·Writ granted.

Maurice T. Dooling, Jr., and F. A. Devlin for Petitioner.

John J. O'Toole, City Attorney, and John J. Dailey, Assistant City Attorney, for Respondents.

THE COURT.—The following opinion, prepared by Mr. Presiding Justice Tyler, when sitting *pro tempore* for Mr. Justice Lennon, is adopted as the opinion and decision of the court:

Petition for mandate to compel the respondents to appropriate and use certain receipts obtained from the operation of the hydro-electric power plants of the Hetch Hetchy project to meet the interest and sinking fund payments on the outstanding bonds of such project and to compel respondents in levying and fixing the tax rate for 1926–1927 to include a tax therein of such amount only as represents the difference between such receipts and the necessary amount required to meet such obligations. Petitioner institutes the proceeding as a citizen, resident and taxpayer and also as a bondholder of the Hetch Hetchy Water Bond Issue of 1910.

For a proper discussion of the case, a brief history of the acquisition and purposes of the public utility in question becomes necessary. In the year 1901, the city and county of San Francisco, through its then mayor, initiated certain proceedings having for their object the acquisition of a water supply for such city. Thereafter application was made to the Secretary of the Interior of the United States for permission to enter upon the lands within the boundaries of the Yosemite National Park and the Tuolumne Forest Reserve to construct the necessary works for storing and conveying waters beyond the boundaries of said park and reserve lands, and ultimately to San Francisco and the bay region for use by the city and county. On the 11th day of May, 1908, Honorable James R. Garfield, then Secretary of the Interior of the United States, rendered his decision granting to the city and county certain rights to develop the storage of the waters from Lake Eleanor and Cherry Creek sections, together with rights to thereafter develop the Hetch Hetchy sources of water supply. Under the terms of

the said permit so granted, the city and county was obligated within two years to submit the question of said water supply to a vote of its citizens. In conformity with this requirement and in the year 1909, the Board of Supervisors duly enacted an ordinance calling for a special election to be held for the purpose of submitting to the electors two propositions, the first of which was one to incur a bonded debt of forty-five million dollars for the acquisition, construction and completion of a water supply and works to be owned and controlled by the city of sufficient capacity for all purposes, the source of such supply to be Lake Eleanor, the waters of the Tuolumne River and its tributaries, in Tuolumne County. The other proposition had to do with the acquisition of the Spring Valley Water Company, an existing public utility. On January 14, 1910, the voters of San Francisco adopted the first proposition and rejected the second. Thereafter bonds in the sum of forty-five million dollars were issued by the city, which were sold and the proceeds thereof were placed in the treasury of said city. Subsequently, the Secretary of the Interior caused to be served a notice upon the city to show cause why the right granted to the city should not be revoked. It was later decided that the Secretary of the Interior had no authority in the premises and that it was necessary to secure a grant from Congress to permit the city to enter upon the forest reserve and park lands for the development of the water resources in question. Such a bill was introduced in Congress commonly known as the Raker Act, which was finally passed and it provided for the necessary authorization. It was only upon the final passage of this act that the city's rights in the Hetch Hetchy region were made permanent. Under the terms of the Raker Act certain conditions were imposed upon the city in the development of the water rights and privileges granted to it by the act. Many of these conditions, so it is alleged, were more onerous than those contained in the original permit, as they required the development of water and hydro-electric power not contemplated under the original grant. Thereafter, and by reason of these alleged newly imposed conditions, the city made radical changes in its plans. It was decided that the main storage should be located in Hetch Hetchy Valley. It was also decided to build one large power-plant at Moccasin

Creek instead of the many smaller ones originally contemplated. With the proceeds of the sale of the bonds, construction of the work was then commenced and proceeded with. A structure known as O'Shaugnessy Dam was erected at the end of Hetch Hetchy Valley to impound the waters of the Tuolumne River, and a system of aqueducts and tunnels were built to convey the water to the power-plant. There was also erected two hydro-electric generating-plants, known as the Early Intake and Moccasin Creek power-plants, to be used to generate hydro-electric power by use of the water developed in the construction of the water system, and a transmission line was also constructed from the Moccasin Creek plant to the town of Newark. All the expenditures necessary for these improvements were made out of the 1910 bond proceeds. At this stage of the development of the works the funds became exhausted and during the year 1924 an additional ten millions of dollars was authorized for the work by the electors of the city. These bonds are being sold and the proceeds thereof are to be expended in the development of the enterprise, but they are not here involved. The water system at present is still far from complete and it is admitted that it will require an additional sum in an amount estimated at about twenty-four million dollars to complete the same to a point where it will be possible to deliver water to the boundaries of the city and approximately another forty million dollars to acquire or construct a distributing system before avail of the water can be made by the consumers of the city. On July 1, 1925, the power plant was ready to function and generate hydro-electric energy and on said day the Board of Public Works of the city of San Francisco, pursuant to authorization, entered into a contract with the Pacific Gas and Electric Company for the temporary distribution of the hydro-electric energy to be generated at the Moccasin Creek power-plant and transmitted to Newark over the constructed transmission lines. The petition alleges that under and by virtue of this contract, the Pacific Gas and Electric Company has paid to the city for electric energy the total sum of $2,017,130.49, and of this sum, after deducting operating expenses, there remains a balance of not less than $1,752,769.63. The outstanding water bonds of 1910 amount to thirty-eight million dollars, and they are being redeemed at the rate of one

million dollars a year. The interest and sinking fund requirements on these bonds for the fiscal year 1926–1927 amount to the sum of $2,830,685.35. It is charged in the petition that respondents have taken proceedings by ordinance to create a special fund, designated as the Hetch Hetchy Power Operative Fund, and have provided that all moneys received from the power-plants on the Hetch Hetchy project shall be deposited to the credit of such fund (Ordinance No. 6980, N. S.). Under this ordinance the sum of $166,666 was appropriated during the fiscal year 1926 for operating expenses, the further sum of $83,333 as a depreciation reserve fund, and a sum for the payment of interest on and redemption of $9,000,000 only of the water bonds of the issue of 1910. The ordinance provides that at the beginning of the fiscal year, July 1, 1926, the balance remaining in such fund shall be held for and applied exclusively towards the acquisition or construction of a transmission line and step-down station for carrying the electric energy generated at the Moccasin plant from Newark to San Francisco. It is further charged that in pursuance of the design to wrongfully divert and use the earnings of these plants, respondents intend to make interest and sinking fund payments on nine million dollars only of the Water Bonds of 1910, and to divert the balance to the construction of a transmission line from Newark to San Francisco, and the step-down station, and to this end the Board of Supervisors adopted a resolution (No. 25364, N. S.) by which they purported to appropriate $20,000 from the Hetch Hetchy Fund as created by them for the expense of preparing plans, specifications and estimates for the completion of the transmission line and station referred to. The estimated cost of these improvements will be approximately $1,800,000 and it is alleged that this amount is to be expended without first appropriating and setting aside from the receipts the amount necessary to take care of the total interest and sinking fund requirements of the outstanding bonds authorized by the electors of the city, except only an amount sufficient to meet such requirement on $9,000,000 thereof. In the estimate transmitted to the Board of Supervisors by the auditor of the probable expenditures of the city for the fiscal year 1926–1927, pursuant to section 2, chapter 1, article III of the charter, it is calculated that the total amount required

for bond interest and redemption on the Water Bonds of 1910 is the sum of $2,830,685.35 and that the portion of that amount to be paid on $9,000,000 of said bonds from the Hetch Hetchy Power Operation Fund is the sum of $530,-188.16. In making up the budget for the fiscal year 1926–1927 the Board of Supervisors accepted these figures and intend and threaten, so it is alleged, to use only this sum of $530,188.16 from said fund for meeting interest and sinking fund payments on the Water Bonds of 1910, and to raise the balance necessary for that purpose by taxation. This will leave a balance in the fund of not less than $1,222,581.47 which the respondents intend and threaten to use for the construction of the stated improvements mentioned. If this latter sum is used to meet the interest and sinking fund payments on the bonds, the amount necessary to be raised by taxation for that purpose will be reduced, so it is alleged, to the sum of $1,077,915.72, which will mean a saving to the taxpayers of $1,222,581.47, or approximately twenty cents on the tax rate of each one hundred dollars assessed valuation. Respondents do not deny that they intend to use the earnings of the hydro-electric plant as alleged in the petition, but they claim that before the board can determine how much to include in the tax levy to cover interest on and redemption of outstanding bonds, it will be necessary for the board to take proper official action in the matter of determining the proportion of the 1910 bond issue used in the construction of the power system and the proportion thereof which was used in the construction of the water supply and works. They claim that in making this allocation it will be entirely proper for the board to apportion to the power development a fair proportion of cost of conduits, lands, dams and water supply system as recited in the Raker Act and it is admitted that action has been taken by the board looking to this end in the passage of a resolution. The exact amount will not be determined until the allocation of expenditure from the 1910 bond funds is made officially by the board. It is petitioner's contention that, under the charter of the city, the entire surplus earnings.must all be devoted to meet the interest and sinking fund payments on all the outstanding bonds of the entire water bond issue of 1910, and that such surplus earnings consist of the amount remaining after deducting only the

operating expenses and costs of repair. Respondents, on the other hand, contend that it is their right under the charter provisions governing the operation of public utilities, and providing for the distribution of the revenues derived therefrom, to use the moneys which have arisen and will arise from the operation of the hydro-electric plant operated by the city, for the purposes which petitioner alleges they are threatening to do, if in their judgment it will be for the best interests of the city that it should be done. The solution of the question depends upon the proper construction to be given to the charter provisions relating to the acquisition and maintenance of public utilities by the city and the disposition of the earnings of such utilities. A review and analysis of the charter provisions therefore becomes necessary for a proper discussion of the case.

Under article XII of the charter of the city, a complete scheme is provided for the acquisition of public utilities and the disposition of the receipts therefrom. Sections 1 and 3 of such article provide, in substance, that when the Board of Supervisors shall by ordinance declare that the public interest demands the acquisition, construction or completion of any public utility or utilities, or when the electors shall petition the Board of Supervisors in the manner provided by the charter, the Board of Supervisors must procure from the Board of Public Works, through the city engineer, plans and estimates of the cost of original construction and completion by the city of such public utility or utilities.

Sections 4, 5 and 7 of the same article provide that each proposition for the acquisition of such public utility or utilities shall specify the amount of the bonded indebtedness necessary therefor, and the rate of interest thereon, and the Board of Supervisors shall submit to the electors at a special election the question whether such bonded indebtedness shall be incurred. A two-thirds vote is necessary to secure the acquisition of such public utility or utilities.

Section 10 provides for the issuance and sale of the bonds and declares that when issued and sold the proceeds shall be placed in the treasury to the credit of the proper fund and shall be applied exclusively to the purposes and objects mentioned in the ordinance authorizing their issue until such objects are fully accomplished. The charter further provides that at the time of levying the municipal tax and in

making the apportionment the supervisors should take into account and apportion to the several funds the income and revenue estimated to arise during the fiscal year from licenses, fees and other sources, but the income to pay the interest on the bonded indebtedness and to provide for the sinking funds shall always be provided for out of the tax on property; *provided,* that whenever any bonded indebtedness shall have been incurred for the acquisition of any of the public utilities named in article XII of the charter, the surplus earnings of any such utility for the fiscal year may be applied upon the interest and sinking fund of the bonded indebtedness of such utility for the succeeding fiscal year. (Art. III, chap. 1, sec. 10.)

Article XII, so far as it deals with this subject, provides that at the time of levying the municipal tax and in the manner provided for such tax levy, the supervisors shall levy and collect annually a tax sufficient to pay the annual interest on such bonds, and also such part of the bonded municipal indebtedness as will fall due within the succeeding fiscal year; *provided,* that when the interest and sinking fund payments for any fiscal year on the bonds issued for any public utility can be met out of the surplus earnings of such public utility for the preceding fiscal year, no tax shall be levied for such purpose. Such taxes shall be in addition to all other taxes levied for municipal purposes and shall be collected at the same time and in the same manner as other municipal taxes are collected. (Art. XII, sec. 12.)

With reference to the disposition of receipts from public utilities, it is provided that whenever any public utility shall be operated by the city, the receipts from such utility shall be paid daily into the city treasury and maintained in a special fund set aside for such utility and that the supervisors may, from time to time, make appropriations from such funds in the following manner: (a) For the payment of the operating expenses of such utility; (b) for repairs and reconstruction; (c) for payment of interest and sinking fund on the bonds issued for the acquisition or construction of such utility; (d) for extensions and improvements; (e) for a reserve fund. (Art. XII, sec. 16.)

Provision is also made for this reserve fund, it being provided that whenever such fund shall exceed one-half of the payment for operating expenses in the preceding fiscal year,

the supervisors shall have the power to appropriate such excess to the General Fund.

It is apparent that the present controversy has its genesis in the changed conditions presented by the provisions in the Raker Act. Preliminarily it may be said that it is by no means certain that the conditions imposed upon the city by the government made imperative the construction of the extensive power-plant that has been installed. While there is no question that the plan as originally submitted to the taxpayers contemplated the construction and operation of a power system for the generation of power to convey the waters from their source to the boundaries of San Francisco, it is by no means certain that the extensive improvements erected were included under the authorization of the bond issue. However this may be, we are not here concerned with the question as to whether or not the proceeds of the bonds were rightfully used or wrongfully converted in the construction of the power system, as no such question is here presented. The main point that we are called to pass upon is whether or not the entire surplus revenue remaining in the fund created by the board as alleged in the petition and admitted in the answer, must, as a matter of law, be applied toward the payment of interest on and the redemption of the entire outstanding bonds of the 1910 issue. Respondents in support of their proposed action, claim that they are now operating a public utility and receiving revenue therefrom; that they are not operating a water system, and that approximately thirty-four million of dollars must yet be spent before the Hetch Hetchy water is brought to the city limits, and many millions more before a water distribution system can be acquired or constructed. In other words, if we correctly understand the argument of counsel for the city, the claim is made that the power-plant is a separate utility, one that is distinct and apart from the water system, made so by the act of Congress in imposing additional conditions.

[1] The answer to this contention is twofold. Congress has no power to create or force a public utility upon the city, and under the organic law of the city a public utility can be acquired only in one of two ways: First, from funds derived from taxes levied for that purpose; second, from funds derived from the sale of bonds issued for such pur-

pose. **[2]** The Water Bonds of 1910 were voted for a single public utility, namely, a "water supply and works." No proposition was ever submitted to the taxpayer for a distinct power system except in so far as such a system might be included under the term "works." The power-plant, therefore, is not an independent utility, but is an element of the water project only. If, as claimed, the changed conditions rendered imperative the full development of a power-plant the matter could and probably should have been submitted to the taxpayers. But this course, as we have seen, was not adopted. **[3]** Assuming then the power-plant to be included in the acquisition of the water utility, and it is only by doing so that there is any justification for any expenditure of the bond issue for its construction, the proceeds of the utility must be used in the manner pointed out by the charter, as they are earnings of the utility voted for. **[4]** Respondents present the further contention that even conceding this to be true, article XII, section 12 of the charter providing for the purposes for which the surplus earnings of the utility are to be used is applicable only where all of the interest and sinking fund requirements of the bonds issued for a public utility can be made out of the surplus earnings and is inapplicable when such earnings are sufficient to pay a part only of the sum required for such purpose. In other words, that a well-defined line can be drawn between a public utility which has been completed and one which is still under construction. In support of this contention it is claimed that under article XII, section 16, a discretion is given to the supervisors as to whether or not the earnings shall be so used, as is indicated by article III, chapter 1, section 12, which provides that whenever any bonded indebtedness shall have been incurred for the acquisition of any of the public utilities named in article XII, the surplus earnings of any such utility for the fiscal year *may* be applied upon the interest and sinking fund requirements. The charter makes no express distinction between the earnings derived from the utility whether completed or not, and we do not think that any implication in this particular can be drawn from the provision invoked. Such construction would be unreasonable and nullify the plain intent of the statute. (See *San Joaquin Irr. Co.* v. *Stevinson,* 164 Cal. 221 [128 Pac. 924].)

[5] The claim, however, that article XII, section 16, by use of the word "may" gives the supervisors a discretion in the application of the use of the surplus funds, presents the real important question in the case. If the supervisors are given a discretion as to the use which may be made of the earnings, they are acting within their rights. It will be noticed from the charter provisions hereinabove set forth, that there are three separate sections which deal with the question as to the use that is to be made of the receipts of a public utility for interest and sinking fund requirements. To recapitulate, article III, chapter 1, section 12, provides in part that such earnings *may* be applied for such purpose. Article XII, section 12, declares that when the interest and sinking fund payments for any fiscal year on the bonds issued for a public utility can be made out of the surplus earnings, no tax shall be levied for such purpose. Article XII, section 16, provides that the supervisors *may* make appropriations from the receipts for the following purposes: (a) For operating expenses; (b) repairs and construction; (c) interest and sinking fund requirements; (d) extensions and improvements; (e) Reserve Fund. These sections were all passed at the same time, are *in pari materia* and should therefore be construed as one statute. (*Banks* v. *Yolo County,* 104 Cal. 258 [37 Pac. 900]; *Hayne* v. *San Francisco,* 174 Cal. 185 [162 Pac. 625].) In so construing them certain statutory rules of construction should be observed to ascertain their proper meaning. [6] Language defining the powers of municipal corporations and grants thereto are to be strictly construed and any fair reasonable doubt concerning the existence of a power is to be resolved against the corporation. [7] Then again, as tax proceedings are *in invitum,* laws pertaining thereto are to be strictly construed in favor of the taxpayer and against the taxing power. (*East Bay Mun. Utility Dist.* v. *Garrison,* 191 Cal. 680 [218 Pac. 43]; *Estate of Potter,* 188 Cal. 55 [204 Pac. 826]; *San Christina Ins. Co.* v. *San Francisco,* 167 Cal. 762 [52 L. R. A. (N. S.) 676, 141 Pac. 384].) [8] So also where persons or the public have an interest in having an act done by a public body *"may"* in a statute means *"must."* (*Hayes* v. *Los Angeles County,* 99 Cal. 74 [33 Pac. 766].) Words permissive in form, when a public duty is involved, are considered as mandatory. (*Kennedy* v. *City of Sacramento,* 19

Fed. 580.)   Guided by these rules, it seems clear to us that
there is no question but that the word "may" when used in
the provisions dealing with this subject does not confer or
repose any discretionary powers in the supervisors but must
be construed as meaning *must*.   If this were not so, the
express mandatory provision contained in article XII, sec-
tion 12, to the effect that no tax shall be levied for interest
and sinking fund requirements when they can be met out of
the earnings of the utility would be meaningless.   We are
likewise of the opinion that the use of the word "may" in
article XII, section 16, does not give the supervisors a dis-
cretion over the order in which the appropriations therein
authorized may be made.   Any other construction would
render meaningless and nugatory the other provisions of the
charter and destroy all the safeguards that these provisions
were designed to create.   (See *City of Cincinnati* v. *Roet-
tinger,* 105 Ohio St. 145 [137 N. E. 6].)   This construction
is compelled for other reasons.   The charter does not con-
template the construction or extension of a public utility
except in the manner hereinabove pointed out.   To use the
earnings of a public utility for this purpose would be to
nullify the express provisions relating to the manner in
which such utilities may be acquired and thus destroy the
limitation in this regard which circumscribes the power of
the board.   Under the construction contended for by re-
spondents there could be no limit to the cost of the utility
where receipts accrued therefrom, and this regardless of the
express mandatory provisions declaring that cost and esti-
mates must be submitted before the bond election is had
so that the taxpayer may know the extent of the obligation
he is called upon to assume or reject.   Then again, if the
order of appropriations be construed as wholly discretionary,
respondents could provide for the first four enumerated
purposes wholly by taxation.   They then could transfer to
the general fund all of the reserve fund in excess of one-half
of the operating expenses for the fiscal year (art. XII,
subd. 8, sec. 16) and use such funds for any municipal
purpose whatsoever, thus impressing on the city the burden
of a large tax rate for the purpose of meeting these obliga-
tions.   Counsel for the city concedes that this condition
could be brought about if the officers abused the discretion
which he claims is vested in them under the provision in

question. To adopt the construction contended for by the city would be contrary to common sense and the general policy of the law. [9] Where the language of a statute is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted. (*Goldsmith* v. *Board of Education*, 66 Cal. App. 157 [225 Pac. 783].) We must decline, therefore, to give a construction that leads to a result so at variance with the general scheme of the charter provisions dealing with the acquisition of public utilities and the disposition of the revenue derived therefrom and with the general law upon the subject. [10] It is the policy of the law in the absence of a clearly negatived intention to have the funds authorized for a particular purpose expended for such purpose. (*Edwards* v. *City of Helena*, 58 Mont. 292 [191 Pac. 387]; 15 Corpus Juris, p. 584.) And bonds issued must correspond and be used for the purpose for which they were issued. (5 McQuillin on Municipal Corporations, sec. 2203; *O'Farrell* v. *County of Sonoma*, 189 Cal. 343 [208 Pac. 117].)

These principles are reflected in the charter provisions, and in fact a special direction to this effect is contained in article XII, section 10. From what we have said, it follows that it was never intended by the charter that the surplus earnings of a public utility could be diverted from the payment of the interest and sinking fund requirements of all the bonds issued for the acquisition of such utility and that such earnings should be applied to the purposes recited in article XII, section 16, in the order in which they appear so far as they are sufficient for such purposes before any extensions or improvements of the utility can be made with such funds. This conclusion is in accord with an express provision of the charter to the effect that the proceeds of any sale of bonds shall be applied exclusively to the purposes and objects mentioned in the ordinance authorizing their issue until such objects are fully accomplished. (Art. XII, sec. 10.) To the suggestion of respondents that it is extremely important in the operation of a municipal project that the surplus revenue be used at times to make ordinary extensions and improvements to the system, to keep pace with the growing demand, it is sufficient to say that the

extensions here contemplated are not ordinary, involving as they do the alleged expenditure of nearly $2,000,000. The charter provides in what manner such extensions may properly be made. It is for the voters to say whether they are ready at this time to assume the costs of such extension. As stated by petitioner it would seem to be a useless expenditure of funds in the absence of a distributing plant, the acquisition or construction of which, considering its enormous cost, might possibly never be sanctioned by the taxpayer. However this may be, the power-plant being but an incident of the water project, its extension under the circumstances must be provided for by a bond issue with the approval of the taxpayer, there being insufficient surplus earnings after satisfying the charter requirements to pay for such extensions. Any other conclusion would circumvent the express mandatory requirements of the organic law of the city. [11] This being so, there is no authority in respondents to make the contemplated expenditure at this time, as surplus earnings of a public utility cannot be employed to make extensions and improvements until after the interest and sinking fund requirements have been provided for.

This conclusion renders unnecessary a discussion of the question raised by the petitioner concerning the rights of the bondholders. From what we have said it follows that petitioner is entitled to the relief prayed for.

It is accordingly ordered that a peremptory writ of mandate issue in accordance with the prayer of the petition.

Rehearing denied.