[Civ. No. 16263.   Second Dist., Div. Three.   Dec. 3, 1948.]

DAN CROWLEY et al., Appellants, v. BOARD OF SUPERVISORS OF THE COUNTY OF LOS ANGELES et al., Respondents.

Irwin M. Fulop and Holbrook & Tarr for Appellants.

Harold W. Kennedy, County Counsel, and Charles C. Stanley, Jr., Deputy County Counsel, for Respondents.

SHINN, P. J.—This is a proceeding in mandate to compel the Board of Supervisors of Los Angeles County to levy a tax of one-half cent per $100 valuation of assessed property for the current year, and also in subsequent years, to be applied toward making up an accounting or actuarial deficit in the

county peace officers' retirement fund. A peremptory writ of mandate was denied below, and the plaintiffs appeal.

The dispute primarily revolves about the construction to be given certain provisions of the County Peace Officers' Retirement Law (Stats. 1931, ch. 268, p. 477 as amended; Gov. Code, §§ 31900-32082). In 1933, pursuant to authority contained therein, the provisions of this law were duly accepted by the board of supervisors and made applicable to Los Angeles County. As provided in the act, a retirement board was set up, a fund created, and all necessary procedure followed for the functioning of the plan. In brief, the pension system as thus set up provides for retirement allowances for those member officers who retire after specified terms of service or for disability; and pensions are provided for the widows and children of members who meet death under specified conditions. Provision is also made for the voluntary withdrawal of contributions, with interest thereon, upon retirement from the service. The principal sources of income to the benefit fund consist of payments made by peace officers based upon certain percentages of monthly salaries earned, and payments of certain amounts by the county, to be hereinafter discussed.

In respect to the county's contributions to the fund, the original act read in part (§ 4): "There shall be paid into said fund the following moneys to wit: . . . (2) An amount to be determined and appropriated each year by the board of supervisors. Said amount to be sufficient, together with the contributions of Peace Officers to meet all of the demands against said pension fund." By statutes 1935, chapter 336, page 1163, the words "including interest" were added after the word "demands"; and by statutes 1941, chapter 745, page 2269, the word "current" was inserted before the word "demands." By statutes 1945, chapter 455, page 949, the following words were added after the word "fund": "And shall in no event be less than the total amount which will be contributed by members during such year." In the codification of 1947 (Stats. 1947, ch. 424, p. 1292), the foregoing provisions were redrafted, but without substantial alteration in meaning, and were carried into the Government Code as section 32029, reading as follows: "The board of supervisors shall determine and appropriate each year an amount sufficient, together with the contributions of the peace officers, to meet all of the current demands, including interest against the fund. The amount shall not be less than the total amount which shall be contributed by members during that year."

Section 4 of the original act was further amended by statutes 1945, chapter 455, page 949, by inserting a provision which, in 1947 with some immaterial verbal rearrangements, became section 32030 of the Government Code, reading as follows: "The board of supervisors may appropriate an additional amount, not to exceed the sum which would result from a tax levy on all of the property in the county subject to taxation of one-half cent ($0.005) per one hundred dollars ($100) of assessed valuation, to reduce or eliminate any deficit in the fund. The board of supervisors shall deposit monthly all contributions received in the county treasury to the credit of the fund."

Section 15 of the original act provided that boards of supervisors "shall have jurisdiction and power" to levy a special tax not to exceed one-half cent per $100 of assessed valuation "to be used for the payment of pensions and annuities to county and township employees under such pension, retirement and benefit systems or associations as may have been established by law for county and township employees." (Stats. 1931, ch. 268, p. 482.) By statutes 1941, chapter 745, page 2274, this section was amended to remove the tax limitation of one-half cent per $100 of assessed valuation, and as thus amended, became in 1947 section 31200 of the Government Code. In codification, however, the original words "shall have jurisdiction and power" were changed to "may," so that section 31200 now reads, "'The board of supervisors may levy a special tax to be used for the payment of pensions and annuities to county and township employees . . ." etc.

It is evident, from a reading of the foregoing provisions, that the board of supervisors is under a mandatory duty annually not only to match the contributions of the members, but also to provide sufficient funds to meet all current demands, including interest, against the fund. In addition, pursuant to section 32030, the board "may" provide further sums "to reduce or eliminate any deficit in the fund." The primary issue for our consideration is whether the word "may," as used in section 32030, should be construed as imposing a mandatory duty upon the board where, as is conceded to be true in the present case, a deficit in the fund exists. The trial court rejected plaintiffs' contention that the statute imposes such a mandatory duty.

It is conceded that a deficit exists from an accounting standpoint, and also from an actuarial standpoint. An accounting deficit is described as that deficit which would exist if all

present members of the system were now to withdraw their contributions with interest, thus practically terminating the system, and leaving such balance as might thereafter remain in the fund as the only money available for the payment of future installments on all pensions which have already accrued. As of December 31, 1946, this deficit amounted to the sum of $1,827,687.50, and it was estimated that by September, 1948, it will have increased to the sum of $2,098,830. We do not understand this type of deficit to be one which appellants seek to have removed and we shall not discuss it further. However, it is manifest that a sudden termination of the system cannot be envisaged as a contingency to be considered, since the county will be deemed to have perpetual existence and no retiring police officer can fail to receive the full amount of his retirement allowance, inasmuch as pension payments are a general obligation of the county for which the board of supervisors must make provision annually. (See *England v. City of Long Beach*, 27 Cal.2d 343 [163 P.2d 865].)

The actuarial deficit, on the other hand, is said to be the deficiency which it is estimated would result if one were to use the present assets, and the contributions which may be expected to be received in the future, to pay all pensions already accrued and all future estimated pensions and withdrawals of presently active members. This calculation assumes the continuance of present rates of contribution and appropriation, and of the present bases for calculating benefits, and assumes that there will be no new members. As of June 30, 1946, the actuarial deficit amounted to the sum of $4,193,980.05, and it was estimated that in August, 1947, when the action was filed, it was in excess of $6,000,000. Three factors contributing to this deficit as computed may be mentioned: (1) in 1947 the maximum amount that could be drawn as a pension was increased from $150 to $250 per month. (Gov. Code, § 32055.) Contributions had theretofore been made on the basis of a maximum pension of $150 per month; (2) salaries have been increased, which would automatically operate to increase the amount of pensions; and (3) the Legislature, in 1947, reduced the permissible retirement age from 60 to 55 years. (Gov. Code, § 32050.) It is this actuarial deficit which, so appellants contend, the board of supervisors is required by section 32030 to reduce and ultimately eliminate by means of successive mandatory contributions to the fund in addition to the county's regular contributions thereto. It is not contended that the board of supervisors is legally bound to make

additional appropriations to the fund except for the purpose of reducing or eliminating this deficit, or that the board has any duty in respect to the deficit other than such as may be imposed by the statutes herein discussed. Accordingly, if analysis of the applicable statutes discloses that no such duty has been imposed, the court below was clearly justified in refusing to compel any action whatsoever by the board.

From the quoted statutes, it is manifest that since 1931 boards of supervisors have had express statutory power under the retirement law to raise funds by a special tax levy, although in the period prior to 1941, this power was limited to a levy of one-half cent per $100 of assessed valuation. The statutory provisions authorizing this special levy, however, have always been phrased in permissive terms rather than mandatory ones; and in addition, have always specifically restricted it to "the payment of pensions and annuities." It would thus appear to be designed chiefly as a discretionary power available to boards of supervisors for raising money in carrying out their clearly mandatory duty of appropriating sufficient funds to meet "all current demands" against the fund. (Gov. Code, § 32029.)

It appears, therefore, that boards of supervisors have not been given power directly to levy such a special tax except to meet current demands, and may not make a special levy for the purpose of avoiding or removing a technical deficit in the fund, unless such power can be implied from the language of section 32030. This section, as we have seen, provides that the board of supervisors "may" appropriate annually an amount not to exceed the sum which would result from a one-half cent tax in order "to reduce or eliminate any deficit in the fund." On its face, the section appears merely to define the permissible amount of any additional appropriation toward a deficit in terms of tax revenue. The mere fact that the limitation here imposed is identical to that which, prior to 1941, governed the power to levy the special tax provided for by original section 15 of the law, affords no logical basis for implying a power to tax under the present section. Whether such a power should be implied, however, we find it unnecessary to decide, for appellants state, without contradiction by respondents, that the county has available certain unappropriated reserve funds far in excess of the amount which would be raised by a tax levy of one-half cent per $100 of assessed valuation. It seems to be conceded by the parties that any duty which the board may be

obligated to perform under section 32030 can be complied with by means of an appropriation from these funds, as well as by a special tax levy, and that appellants' petition provided a sufficient basis for granting either form of relief if any was warranted at all. ■ Section 32030, however, does not designate a fixed sum which may be appropriated toward such deficit as may exist, but merely sets a maximum figure which may not be exceeded, thereby leaving to the discretion of the board of supervisors the determination of what that amount should be, within the prescribed limitation. Even if the court had determined that the board was under a duty to act, and had proceeded to compel the board to make some appropriation toward the deficit, it would have been powerless to interfere with the sound exercise of the board's discretion in fixing the amount thereof. (*Allen* v. *Bowron,* 64 Cal.App.2d 311, 313 [148 P.2d 673]; 16 Cal.Jur., Mandamus, § 28, p. 809; cf., *Kentfield* v. *Reclamation Board,* 137 Cal.App. 675 [31 P.2d 431].) ■ Moreover, since whatever duty the board had in the premises could be performed by the appropriation of any sum within the statutory limitation, the court would have been justified in refusing a writ on that ground alone, for no useful purpose would have been accomplished by the granting of such relief, and petitioners would have received no substantial benefit therefrom. Mandamus is not a writ of right, but one of discretion, and will not be issued where it would be useless or unavailing to protect some substantial right of the petitioner. (*Ault* v. *Council of City of San Rafael,* 17 Cal.2d 415 [110 P.2d 379]; *Fawkes* v. *City of Burbank,* 188 Cal. 399 [205 P. 675]; 16 Cal.Jur. 768.) ■ As we shall attempt to demonstrate, however, and as the trial court correctly concluded, there was no duty upon the board to make any additional appropriation in order to reduce the deficit, and the denial of the writ was properly placed upon this ground.

Appellants' contention that the words "may appropriate an additional amount" as used in section 32030 should be construed so as to impose a mandatory duty upon the board of supervisors to make such an appropriation to the fund, is in our opinion without merit. In *Santa Cruz R. P. Co.* v. *Heaton,* 105 Cal. 162, 165 [38 P. 693], the Supreme Court said, "Primarily, and as ordinarily used in a statute, the word '*may*' does not denote the imperative mood of the verb to which it is attached, but merely imports permission, ability, possibility, or contingency; and should never be

interpreted or understood as mandatory, except by compulsion of the context in connection with which it is to be read, showing that the legislature must have used it in that sense. (*Minor* v. *Mechanics' Bank*, 1 Pet. [46] 64 [7 L.Ed. 47] ; *Thompson* v. *Carroll*, 22 How. 434 [16 L.Ed. 387] ; *State* v. *Neuner*, 49 Conn. 233.)'' In accordance with this rule of construction, the word ''may'' has occasionally been interpreted to mean ''shall'' or ''must'' under circumstances requiring such a result in order to give effect to a clear legislative intention to impose a mandatory duty (*Uhl* v. *Badaracco*, 199 Cal. 270 [248 P. 917] ; *Stockton P. & S. Co.* v. *Wheeler*, 68 Cal.App. 592 [229 P. 1020]) ; or where to deny this construction would result in a failure of justice as to persons who would be otherwise without remedy (*Supervisors* v. *United States*, 4 Wall. (71 U.S.) 435, 447 [18 L.Ed. 419], quoted and followed in *Hayes* v. *County of Los Angeles*, 99 Cal. 74, 79-80 [33 P. 766]) ; or where ''the rights of the public or of other persons . . . are dependent upon the exercise of the power conferred'' (*County of Los Angeles* v. *State of California*, 64 Cal.App. 290, 297 [222 P. 153] ; *Gridley Camp No. 104* v. *Board of Supervisors*, 98 Cal.App. 585 [277 P. 500]). But where considerations such as this do not clearly obtain the normal permissive meaning of ''may'' will prevail. (*Roberts* v. *Duffy*, 167 Cal. 629, 638 [140 P. 260] ; *Ostrander* v. *City of Richmond*, 155 Cal. 468 [101 P. 452] ; *Kemble* v. *McPhaill*, 128 Cal. 444 [60 P. 1092] ; *Santa Cruz R. P. Co.* v. *Heaton*, 105 Cal. 162, 165 [38 P. 693].)

Conceding the correctness of the foregoing principles, appellants contend that a mandatory reading must be accorded the word ''may'' in section 32030 on the ground that the public welfare and rights of members of the system depend upon an exercise of the power granted, and also upon the ground that the actuarial nature of the retirement plan itself renders this construction imperative in order to give full effect to the legislative intent. Analysis of the function and purpose of the retirement law convinces us that this position cannot be maintained.

Appellants' argument is premised upon the proposition, as stated in their brief, ''that the 'System' contemplated under the Law, from its inception was (a) an actuarial reserve system with (b) the cost to be divided between the government and its employees on an employee-contribution basis.'' Appellants admit that ''*actuarially* the original plan was poorly organized,'' but state that ''the Law, during the intervening

years, has greatly changed and considerably developed, generally in the direction of *sound* actuarial practices." In support of the latter statement, they make reference to the amendments to the law which were enacted in 1941, and emphasize that, in addition to the statutory changes outlined above, the Legislature in that year required the retirement board to cause an actuarial investigation of the system to be made at once, and thereafter at not to exceed five-year intervals; and, on the basis of this investigation, the retirement board was required to "recommend to the board of supervisors such changes in the rate of interest, in the rates of contributions of members, as well as such changes in county appropriations as may be deemed necessary. No adjustment shall be included in the new rates for time prior to the effective date of such revision. Said board of supervisors shall promptly thereafter adjust the rate of interest, the rates of contributions of members, and county appropriations, as deemed advisable, but in no event shall said board of supervisors fix the rate of interest, the rates of contributions of members or county appropriations that will have the effect of reducing the amount of individual benefits as provided for herein." (Stats. 1941, ch. 745, p. 2267; Gov. Code, § 31963-4.) A further amendment of the same year abolished the previous uniform two per cent rate of contribution by members, and provided that member contributions should thereafter be calculated at a percentage of salary "such as will provide an average annuity at the lowest age at which the respective members shall be eligible for service retirement" equal to a full retirement pension. (Stats. 1941, ch. 745, p. 2267; Gov. Code, § 32021.) Until revised by the board of supervisors on the basis of an actuarial recommendation, as described above, the amendment prescribed temporary member contribution rates ranging from 4.31 per cent for those aged 21 years or less to 10.47 per cent for those of age 40 or over. (Stats. 1941, ch. 745, p. 2268; Gov. Code, § 32022.)

Respondents do not deny that the amendments of 1941 were designed to place the retirement system upon a sound actuarial basis for the future. In November, 1946, the retirement board, on the basis of an actuarial investigation made pursuant to these amendments, made a report to the board of supervisors containing three major recommendations: (1) that the interest assumption rate be reduced from 3 per cent to $2\frac{1}{2}$ per cent; (2) that rates of contributions of mem-

bers be changed to a scale ranging from 4.78 per cent at age 21, to 11.35 per cent at age 40; and (3) that the board of supervisors make employer contributions to the fund, in addition to matching employee contributions, in an amount equal to the sum that would be realized by a tax of one-half cent per $100 of assessed valuation of property in the county. The board of supervisors adopted recommendations (1) and (2) but declined to adopt number (3).

Upon the basis of the 1941 amendments, and the foregoing action taken by the board of supervisors, the parties agree that the system has in fact been placed upon a sound actuarial basis *for the future*. It is not questioned that all presently contributing members and all new members will make their future contributions at rates calculated according to sound actuarial principles; and that eventually the system will be composed exclusively of those who enter it hereafter, all of whose contributions will have been theoretically sufficient, when matched by equal county contributions, to maintain a sound actuarial reserve, and thus preclude the existence of a future actuarial deficit as to them. We note that in defendants' answer it was alleged, and it was admitted by plaintiffs, that the contributions to be made by members of the system and the county, from the date of the filing of the answer to September 1948 would amount to approximately $700,000; whereas, for the same period, demands for pension payments, plus estimated withdrawals by members leaving the system (as based on the highest previous semiannual withdrawal), and interest that would accrue to members upon their contributions, totaled $431,150, leaving an excess of contributions over current demands of approximately $268,850. It is not contended by the defendants, however, that the present contributors furnish sums applicable to the deficit or that the deficit will be removed except over a period of years during which there will be a gradual cessation of drains upon the fund in favor of those who have already retired and those whose rights have accrued during the period when the contributions and appropriations by the board of supervisors have been insufficient to maintain the system upon an actuarially sound basis.

Appellants argue that a prolonged existence of the said deficit would be highly inconsistent with the actuarial basis of the system, and that fulfillment of the evident legislative purpose demands a full utilization of the statutory powers of the board of supervisors in order to eliminate the said deficit

as soon as possible and thus render the system actuarially sound retrospectively as well as prospectively. They assume that there can be but two types of public pension systems, namely, the assessment or cash disbursement plan, in which all benefits are paid as they fall due from current revenues of the government, aided perhaps by member contributions, and the actuarial reserve plan, in which contributions are paid to a fund which will be sufficient with the compound interest it will earn to pay for all the benefits which will ever fall due as a result of the service rendered during the period covered by the payment. (Meriam, Principles Governing the Retirement of Public Employees, p. 60.) The whole tenor of appellants' argument is to deny that the Legislature intended the peace officers' pension system to operate on any basis other than that of a purely actuarial reserve plan. It is clear to us, however, that the system under consideration is a combination of the two. The recent amendments to the law, and the action taken thereunder, have concededly placed the system upon a sound actuarial basis for the future, but in the absence of a clearly mandatory provision in the law for accumulating assets to meet any existing actuarial deficit which might have arisen from operations of the system prior to the 1941 amendments, it is not unreasonable to infer that the Legislature contemplated that ''for a certain number of years'' the system would, ''to that extent, operate on the assessment or cash disbursement basis.'' (Mariam, *opere citato*, p. 356.)

Appellants' argument, on final analysis, is that the retirement system created in 1931 was one which was intended to provide sufficient income from contributions of members and appropriations of county funds to create a fund which, in itself, would be adequate at all times to meet all demands upon it. In other words, it was intended that no deficit should be allowed to exist at any time, and that the board of supervisors should be under an affirmative duty to prevent the occurrence of a deficit or to promptly remove one which might occur. In formulating their contention, appellants do not reason from what the Legislature did at the time the law was first enacted, but from what the Legislature could have done to avoid the occurrence of the deficit that developed by reason of the inadequacy of the small contributions which were provided for originally. They refer to the recent amendments as indicating that the Legislature could have had in mind nothing but an ideal or perfect actuarial plan, namely, such a plan

as would be considered adequate if the employer were a private corporation which might at any time go out of existence. What the Legislature has done in subsequent years, however, is only what it failed to do originally, namely, to make provision for prospective actuarial soundness. The 1931 act provided an adequate substitute, namely, a continuing obligation of the county to meet all demands upon the fund annually as they accrue. While this provision was originally necessary to meet such demands until an adequate reserve should be built up, it would seem that the continued maintenance of this form of security to the present time indicates that the Legislature never intended to make it mandatory upon boards of supervisors to provide an alternative or substitute form of security in the way of a completely sufficient actuarial reserve fund, but that the decision to do so was left to their discretion.

In support of their argument, appellants quote section 31902 of the Government Code (formerly § 16 of the original law, Stats. 1931, ch. 268, p. 482), which requires that the law be given "a liberal interpretation with a view to carrying out its purpose." According to section 32030 and section 31964 a merely permissive construction, however, is fully consistent with the purpose of the retirement law, for such a construction can in no way adversely affect the rights of the public or of members of the system, or impair its operation. The funding of an existing actuarial deficit is purely a matter of fiscal policy which the Legislature has seen fit to leave to the discretion of the respective boards of supervisors, who presumably would be more familiar with the financial status of the system in their respective counties, and would be in a better position to evaluate the various factors entering into a decision to fund such a deficit by means of additional taxation. It is not contended that present or future members of the system will have their contribution burdens increased because of the present actuarial deficit. Furthermore, in view of the express requirement that member contribution rates "shall be based on age at the nearest birthday at the time of entrance into the system" (Gov. Code, § 32020), and the further provision that in the retirement board's recommendations for revisions in the contribution rates, "no adjustment shall be included in the new rates for time prior to the effective date of the revision" (Gov. Code, § 31963), it is doubtful that any such burden could be legally imposed upon the members under the present law. It would thus appear that ultimately the deficit must be borne by the county, and whether

it chooses to do so now or at some future time is a matter within the discretion of the board of supervisors with which the court may not interfere, since in either event the purpose of the retirement law would be carried out.

In view of the fact, therefore, that the purpose of the act can be fully accomplished and the contemplated public benefit completely secured without the contribution by the county of additional sums to be placed in the reserve fund, and the further fact that the members of the system have and can have no claims upon the fund which will not be paid as they fall due, there would appear to be no justification for giving to section 32030 of the Government Code a mandatory meaning. Such a construction would, in effect, rewrite the law in form and in substance and thus create a pension retirement system which the Legislature did not create originally, and which, in all of the subsequent amendments of the law, it has failed to convert into a purely actuarial reserve system.

Moreover, we cannot agree with appellants' alternative (and somewhat inconsistent) contention that full power and authority to manage the retirement fund was vested in the retirement board, to the exclusion of any discretion in the board of supervisors. It is urged that sections 31963 and 31964, quoted above in part, require this conclusion when read with the context of the act as a whole and in view of the legislative intent. Section 31963, as we have seen, merely requires that the retirement board shall *recommend* changes in rates of interest, contribution rates and appropriations to the board of supervisors, a duty which carries no implication of a power to *prescribe* such changes, subject only to a mere ministerial act of approval by the board of supervisors. Section 31964, on the other hand, provides that the board of supervisors, on receipt of the retirement board's actuarial recommendations, "shall promptly adjust the rate of interest, the rates of contributions of members, and county contributions, *as it deems advisable.* . . ." The words we have italicized, particularly where used in respect to mere *recommendations* of the retirement board, are clearly permissive in nature, denoting discretion rather than compulsion, and in the absence of a clear indication of a contrary legislative intention, or compelling circumstances of necessity, can be no more susceptible of a mandatory construction than the word "may" as used in section 32030. Even if a delegation to the retirement board of powers of appropriation of county funds which rests with the board of supervisors, could be legally accom-

plished, it is clear that we cannot attribute to the Legislature an intent to bring about this extraordinary result where there is no expression of such purpose in the entire act. There may be some question as to whether a mandatory interpretation of this provision may not be required in respect to member contribution rates, especially if section 31964 is read *in pari materia* with section 32021, which sets forth the required standards upon which the retirement board is to calculate those rates. We find it unnecessary to determine this point, for when section 31964 is read in connection with section 32030, the deficit appropriation section, it is clear that a permissive construction is the only justifiable one for the limited purpose of the present action. The board of supervisors acted fully within its powers in rejecting the retirement board's 1946 recommendation to make additional appropriations toward funding the deficit. Under the applicable statutes, a writ of mandamus to compel such an appropriation would be clearly improper.

The judgment is affirmed.

Wood, J., and Vallée, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied January 31, 1949.