[L. A. No. 18573. In Bank. Aug. 31, 1944.]

R. BERNARD DICKEY, Respondent, v. RAISIN PRORATION ZONE NO. 1 et al., Appellants.

Francis M. Shea, Assistant Attorney General (U.S.), Charles H. Carr and Leo V. Silverstein, U. S. Attorneys, Ron-

ald Abernethy, Assistant U. S. Attorney, Sidney J. Kaplan, Special Assistant Attorney General, Wm. F. Hall, W. S. Ward, Joseph A. Fanelli, Jerome C. Strumpf and Phyllis Campbell, Attorneys, Department of Justice, and Strother P. Walton for Appellants.

Walter M. Gleason, Morgan J. Doyle, William B. Acton and A. Dal Thomson for Respondent.

CURTIS, J.—This litigation concerns the validity of certain features of a marketing program adopted under authority of the Agricultural Prorate Act of 1933 (Stats. 1933, p. 1969, as amended; Deering's Gen. Laws, 1937, Act 143a) for the control of the 1938 crop of raisins and the stabilization of the market therefor. The constitutionality of the act has been sustained by both this court and the Supreme Court of the United States (*Agricultural Prorate Commission of California* v. *Superior Ct.*, 5 Cal.2d 550 [55 P.2d 495] ; *Parker* v. *Brown,* 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315].)

In preparing a marketing program for the 1938 crop of raisins the program committee and other officials of Raisin Proration Zone No. 1—representing some 8,000 producers of raisins in Fresno, Kings, Kern, Tulare and other adjacent counties—determined that the prorationing of crops and financial support of the market were necessary in order to stabilize prices and to assure to raisin growers in the zone a fair and reasonable economic return. Accordingly, prior to September, 1938, and in pursuance of the provisions of the Agricultural Prorate Act, the program committee drafted a marketing plan for raisins for the 1938-1939 season premised upon the following main factors: (1) That 20 per cent of the crop be prorated and declared to be surplus; (2) That all raisin growers be required to deliver that portion of their output to the zone to be placed in a "stabilization pool" to be withheld from the usual channels of trade and commerce in competition with the balance of the crop (hereinafter called the "free" raisins), which would be marketable by the producers in the zone free of any restrictions; (3) That the Commodity Credit Corporation, an agency of the United States and under the general supervision of the Secretary of Agriculture, make available a sum not to exceed $9,000,000 to all producers in the zone desirous of obtaining non-recourse loans on their "free" raisins at a fixed price of $50 per ton,

which was deemed a minimum economic return; (4) That Raisin Proration Association, a nonprofit California corporation, whose directorate was composed of the members of the program committee, act as the conduit through which the money for each loan flowed; and (5) That the zone pledge to the Commodity Credit Corporation all raisins in the stabilization pool for these purposes: (a) as security for loans made to the Raisin Proration Association in an amount not to exceed $4.00 per ton on all pooled raisins to cover handling, storage and insurance costs involved in the pooling operations; and (b) as additional collateral for the total advance of non-recourse loans to individual borrowers on their "free" raisin tonnage.

This marketing plan was effectuated according to the following chronology. After notice of a public meeting on the subject scheduled for September 7, 1938, and an opportunity to be heard thereat was furnished to all raisin producers in the zone, the Agricultural Prorate Commission on September 10, 1938, approved the proposed arrangements and the program committee on September 12, 1938, adopted a resolution setting forth the proration terms. On September 24, 1938, the Commodity Credit Corporation promulgated a resolution reciting the following details affecting the raisin marketing program: (1) That the manager or acting manager of the San Francisco Loan Agency of the Reconstruction Finance Corporation would act as its agent in connection with the $9,000,000 available loan to the Raisin Proration Association and the loans to individual growers; (2) That the Raisin Proration Association should execute a note for $9,000,000 payable November 1, 1939, bearing interest at 4 per cent per annum, payable quarterly; (3) That each advance made to an individual grower be endorsed on this note as credit; (4) That $50 per ton be advanced to growers desiring such loan on non-recourse agreements signed by each grower assigning his "free" raisins as well as his raisins in the stabilization pool as security for the loan; and (5) That the raisins be stored and insured. On October 10, 1938, the Commodity Credit Corporation accepted the $9,000,000 promissory note of the Raisin Proration Association in the form and for the purpose above stated. On October 15, 1938, a "pledge agreement" was executed by the Commodity Credit Corporation and the program committee of the zone and Raisin Proration Association under the terms of which all raisins in the stabili-

zation pool were pledged to the Commodity Credit Corporation in consummation of the aforestated financial arrangements.

During the effective period of said marketing program growers representing 52.74 per cent of the total raisin production in the zone borrowed from the fund made available through the Commodity Credit Corporation, the individual loans aggregating nearly $3,000,000; growers representing the remaining raisin production—47.26 per cent—did not avail themselves of the financing plan. In October and November, 1939, the Commodity Credit Corporation disposed of all the surplus raisins deposited in the stabilization pool by borrowers and non-borrowers alike under the 1938-1939 proration terms, and theretofore pledged to it in the pursuance of the seasonal marketing plan. After crediting its raisin advancement account with the proceeds realized from the disposition of the pledged raisins—the "free" raisin tonnage of the borrowing growers and all the stabilization pool raisins—there still remained a considerable loss to be borne by the Commodity Credit Corporation by reason of its non-recourse loans to the individual growers and the sums advanced to cover expenses incurred by the Raisin Proration Association in handling, storing, insuring and caring for the raisins delivered into the stabilization pool.

In March, 1940, the plaintiff, a raisin producer who had neither borrowed from the available loan fund nor hypothecated either his "free" raisins or his share of surplus raisins in the stabilization pool, commenced this action on behalf of himself and other growers similiarly situated, in protest of the pledge of *all* the raisins in the stabilization pool as security for the loan transaction consummated with the Commodity Credit Corporation for the 1938-1939 marketing season. The gravamen of the complaint brought against the aforementioned agencies instrumental in the effectuation of the contested marketing program—the Raisin Proration Zone No. 1, the Raisin Proration Association and its directorate, the Proration Program Committee and its members, and the Commodity Credit Corporation—is the charge that the pledge of the stabilization pool raisins was "void and illegal" under the Agricultural Prorate Act as to all growers who did not borrow from the Commodity Credit Corporation. Accordingly, the plaintiff prayed that the Commodity Credit Corporation be required to account to the non-borrowing growers for the amounts realized by it on the disposition of the

surplus raisins delivered by them to the stabilization pool. The defendants' demurrers to the complaint, interposed on the ground that the plaintiff's pleading failed to state a cause of action in that the pledge of the entire stabilization pool as an integral part of the raisin marketing program for the 1938-1939 season was valid under authority of the Agricultural Prorate Act, were overruled. Thereafter the defendants filed their answers, wherein they admitted the pledge and disposition of the stabilization pool raisins in the circumstances above outlined but denied the plaintiff's charge of illegality in connection with such transaction, and they also pleaded the following affirmative defenses: (1) Estoppel of the plaintiff and other raisin producers to challenge the validity of the proration program and the security arrangements upon which it was premised; (2) Commodity Credit Corporation's advance of the sum of $226,418.11 to the zone and Raisin Proration Association for handling and storage expense of raisins in the stabilization pool, no part of which amount had been repaid; (3) Impropriety of a class action; (4) Bar of the statute of limitations as provided by section 17 of the Agricultural Prorate Act of 1933, as amended; and (5) Laches. The plaintiff moved to strike these affirmative defenses, demurred to the answers, and requested a judgment on the pleadings, all on the theory that as to non-borrowing depositors in the stabilization pool the integrated marketing program was void and indefensible. The trial court sustained the plaintiff's position on all points, granted the motion for a judgment on the pleadings, entered an interlocutory judgment in the plaintiff's favor and ordered an accounting. Pursuant to a stipulation of the parties herein, a report was filed showing the net proceeds from the disposition of the pledged stabilization pool raisins allocable to the surplus contributed by non-borrowing producers to be $145,166.04. From the final judgment thereupon rendered by the trial court requiring the Commodity Credit Corporation to account in the amount mentioned, the defendants prosecute this appeal.

The principal point at issue herein is the disputed validity of the pledge of the stabilization pool raisins to the Commodity Credit Corporation. All the parties agree that the Agricultural Prorate Act does not *expressly* provide for the challenged procedure, but they differ in their views as to whether the general scheme of the statute sustains the transaction in question. Accordingly, the plaintiff argues that the statutory language does not sanction the negotiation

of such pledge agreement, while the defendants claim that authority to enter into such financial arrangement must be implied as incidental to the express powers granted to the Proration Program Committee for the effectuation of an adequate marketing plan. Careful analysis of the act with reference to these opposing arguments confirms the defendants' position as to its intendment.

In attacking the problem of statutory interpretation here presented it is essential to remember the basic principle unqualifiedly declared by this court on numerous occasions and well stated in 23 Cal.Jur. section 107, page 725, as follows: "It is a cardinal rule that statutes are construed according to the intention, or at least according to the apparent or evident intention or purpose, of the lawmakers. Such intention controls, if it can be reasonably ascertained from the language used. Indeed, it has been said that the legislative intent in enacting a law is the law itself. Accordingly, the primary rule of statutory construction, to which every other rule as to interpretation of particular terms must yield, is that the intention of the legislature must be ascertained if possible, and, when once ascertained, will be given effect, even though it may not be consistent with the strict letter of the statute. In other words, as is declared by the code, 'in the construction of a statute the intention of the legislature ... is to be pursued if possible.' [Code Civ. Proc., § 1859.] Certainly the language of a statute should never be so construed as to nullify the will of the legislature, or to cause the law to conflict with the apparent purpose had in view by the lawmakers." (*In re Haines*, 195 Cal. 605, 612 [234 P. 883]; *County of Los Angeles* v. *Frisbie*, 19 Cal.2d 634, 639 [122 P.2d 526].)

In section 1 of the act is set forth the declaration of the Legislature as to the reason and purpose of the enactment: "The unreasonable waste of agricultural wealth occasioned by the harvesting, preparation for market and delivery to market of greater quantities of agricultural commodities than are reasonably necessary to supply the demands of the market is opposed to the public interest and the difficulty inherent in any attempt by individuals to correlate within a reasonable degree the supply of any agricultural commodity to current consumptive demands is creating chaotic economic conditions in certain agricultural areas of the State of such severity as to imperil the ability of agricultural producers to contribute in appropriate amounts to the support of ordi-

nary governmental and educational functions, thus tending to increase and increasing the tax burdens of other citizens for the same purposes. In the interest of the public welfare and general prosperity of the State, the unnecessary and unreasonable waste of agricultural wealth, hereinafter referred to as 'agricultural waste,' involved in the harvesting or preparation for and delivery to market of agricultural commodities for which there exists only a limited consumer demand should be eliminated while at the same time preserving to all agricultural producers an equality of opportunity in the available markets.''

The act provides for the creation of an Agricultural Prorate Commission consisting of nine members to be appointed by the Governor by and with the consent and approval of the Senate. (§ 3.) This commission is empowered to establish prorate zones and to hear and approve petitions for marketing programs in accordance with the procedural requirements of the act. (§ 8.) The act contemplates local handling of a prorate program by a program committee appointed by the commission from producers and packers operating within the proration zone. (§ 18.) The marketing program cannot go into effect until approved by the Agricultural Prorate Commission. (§ 18.1.) After its adoption it becomes binding on every producer of the regulated commodity in the zone and must be followed by all of them; penalties are provided for any disobedience. (§§ 24, 25.)

Speaking generally, the program committee should determine the total of the regulated commodity to be produced in a crop year, the percentage of that total which can be marketed profitably in the usual and ordinary channels of trade, and the percentage which cannot be so marketed without flooding the market and breaking the market price. The percentage of the commodity which can be absorbed by the market is left under the free control of the producers, who may market and dispose of that proportion of their crops as they please without any restrictions. The balance of the commodity which cannot be absorbed in the usual channels of trade is designated as surplus, which must be delivered to the program committee of the zone and put into a stabilization pool, where it is held, cared for and disposed of by the committee in such a manner as not to come in competition with the ''free'' portion of the crop. By section 19.1 the act expressly declares:

''The program committee, for the purpose of minimizing

the effect of existing surpluses upon market conditions, shall be empowered in any or all of the following particulars:

"(a)  To establish and maintain surplus pools which shall be authorized to receive from each producer from time to time his surplus of the prorated commodity and market the same by grades for the account of the producer when it can be advantageously disposed of either in its original or some converted state; provided, however, such surplus shall not be marketed in any form which would directly compete with that part of the crop which is regularly certificated; and provided, further, that any part of any such surplus may be turned over by a program committee to charitable organizations, self-help cooperatives, and similar agencies under proper safeguards to prevent any part of the commodity so disposed of from directly competing with the part of the crop marketed through the usual channels of trade. In operating any such surplus pool, a program committee may fix grading, packing and servicing charges to be assessed against such commodities received by the pool and requiring such handling. The program committee shall handle all commodities received by a surplus pool and account for the same on a pooled basis. Each producer delivering his surplus to a pool shall be credited for his proportionate share of the surplus so delivered.

"(b)  To create, establish or otherwise obtain and operate facilities for the grading, packing, servicing, processing, preparing for market and disposal of such surplus in such manner as to maintain stability in the markets and to sell such surplus and/or any of its derived products. . . .

"(d)  To collaborate and cooperate with agencies or organizations with similar purposes, whether of this State, other States or of the United States, in the formulation and execution of a common marketing program; provided, that in proper cases the commission may require such collaboration and cooperation. . . .

"The cost of the exercise of such powers as are herein granted to the program committee shall be a part of the cost of the operation of the program and shall be obtained through fees in the same manner as other costs of the program."

From the above-quoted language of the act it is plain that its primary purpose is to eliminate "the unnecessary and unreasonable waste of agricultural wealth" and to insure to agricultural producers a fair financial return on their crops

"in the interest of the public welfare and general prosperity of the State." Equally plain is the act's contemplation that its purpose would be accomplished by marketing programs which would minimize the "effect of existing surpluses upon market conditions" and which would provide for the "disposal of such surplus in such manner as to maintain stability in the markets." The surplus represents—in the language of the statute—"agricultural waste" and is subject to the control and disposition of the program committee in attempting to obtain a maximum economic return for the prescribed "free" portion of the regulated commodity. In short, the proportion of his crop which each producer must deliver to the stabilization pool represents a contribution to the economic stability of the zone—a contribution predicated upon the assumption of its relative economic worthlessness and in consideration of a fair return on the "free" marketable balance. The contributing producer knows that his surplus will be kept out of the competitive market and that compensation for it may well not be forthcoming. Thus, the program committee is expressly enjoined by the act from marketing the surplus "in any form which would directly compete with that part of the crop which is regularly certificated," and it is authorized to turn over the surplus "to charitable organizations, self-help cooperatives and similar agencies under proper safeguards" to prevent competition with the "free" marketable raisins in the usual channels of trade.

In *Parker* v. *Brown* (decided January 4, 1943), 317 U.S. 341 [63 S.Ct. 307, 87 L.Ed. 315], the Supreme Court of the United States, in upholding the validity of the California prorate program for the 1940 raisin crop, considered in some detail the development of the raisin industry in this state and the economic conditions necessitating the application of the Agricultural Prorate Act to it. Thus, it is stated in the opinion at pages 363-366: "Examination of the evidence in this case and of available data of the raisin industry in California, of which we may take judicial notice, leaves no doubt that the evils attending the production and marketing of raisins in that state present a problem local in character and urgently demanding state action for the economic protection of those engaged in one of its important industries. . . . The history of the industry, at least since 1929, is a record for a continuous search for expedients which would stabilize the marketing of the raisin crop and maintain a price standard which would bring fair return to the producers. It is sig-

nificant of the relation of the local interest in maintaining this program to the national interest in interstate commerce, that throughout the period from 1929 until the adoption of the prorate program for the 1940 raisin crop, the national government has contributed to these efforts either by its establishment of marketing programs pursuant to Act of Congress or by aiding programs sponsored by the state. . . . Raisin Proration Zone No. 1 was organized in the latter part of 1937. No proration program was adopted for the 1937 crop, but loans of $1,244,000 were made on raisins of that crop by the Commodity Credit Corporation. In aid of a proration program adopted under the California Act for the 1938 crop, a substantial part of that crop was pledged to the Commodity Credit Corporation as security for a loan of $2,688,000, and was ultimately sold to the Federal Surplus Commodities Corporation for relief distribution.''

Corroborative of the reference in the *Parker* v. *Brown* opinion as to the extension of federal aid on behalf of the 1938 marketing program is the present record's recital of undisputed factual data: That incident to the sudden drop in raisin prices near the close of the 1937 marketing season, chaotic conditions prevailed in the industry and caused application to be made to the Commodity Credit Corporation for financial relief and assistance; that at that time a complete collapse of the market was prevented only by the Raisin Proration Association, organized as an agency of the Prorate Zone and the program committee, effecting a loan arrangement with the Commodity Credit Corporation covering the disposition of an agreed tonnage of pooled raisins through ultimate sale to Federal Surplus Commodities for relief distribution; that to preclude the recurrence of such distressing conditions and to maintain price stability for the succeeding year's raisin production, the aforedescribed program for the 1938 marketing season was duly promulgated, adopted and approved in accordance with the procedural requirements of the Agricultural Prorate Act; that the federal loan from the Commodity Credit Corporation—the only financing available to the raisin industry—was conditioned upon the adoption of a state proration program by which 20 per cent of the crop would be delivered into a stabilization pool and would serve as security for non-recourse loans to borrowing producers, as well as for costs of handling and storing the pooled raisins, in pursuance of a pledge agreement executed as above outlined.

■ In short, the 1938 program minimized the effect of surplus production by prorating the season's raisin crop by 20 per cent, and it achieved market stability through a federal agency, the Commodity Credit Corporation, which made its financial resources available and effectively pegged the price of 1938 raisins at not less than $50 per ton. The pledge of the stabilization pool raisins was an essential and integral part of the financing plan to withhold the prescribed surplus from the season's market so as not to glut it and crowd down prices to a point below the cost of production. *All* raisin growers in the zone profited from the marketing program regardless of whether they availed themselves of the loan funds, for so long as Commodity Credit Corporation's offer of financing overhung the market, non-borrowers as well as borrowers were assured of at least $50 per ton for their "free" crops. Proration alone would not have stabilized prices and insured the raisin industry a fair monetary return, for without available financial support many of the growers would have been compelled by economic necessity to throw their "free" crops on the market as soon as possible, thus causing a collapse in prices. So viewed, there can be no doubt that the 1938 marketing program was not only the salvation of the California raisin industry for that year, but also fell within and carried out the basic purpose of the Agricultural Prorate Act.

■ In attacking the pledge agreement covering the stabilization pool raisins, the plaintiff argues that it is violative of the trust plan contemplated by section 19.1, *supra,* of the act—an alleged arrangement whereby the surplus crop constitutes the corpus of the trust, the growers are the beneficiaries, and the zone acting through its program committee is the trustee, a fiduciary with only such powers as are specifically enumerated. But granting that the language of said section imports an agency on the part of the zone and its program committee to receive and dispose of the raisins in the stabilization pool for the benefit of the growers, to whom an accounting must be made for the net receipts, *if any,* derived from the disposition of the surplus commodity, the operation of the pool has still a wider significance than the plaintiff's limited concept of its function would permit. Beyond fixing the duty of the zone and its program committee, in the handling of the pooled raisins, to account for *possible* net receipts realized from their disposition, in pursuance of the fiduciary character of the provision that "each producer

. . . shall be credited for his proportionate share of the surplus'' delivered to the pool, the statute does not purport to set up a formal trust with the contributors to the pool *as such* the sole *cestuis* thereof. Rather the statutory scheme envisages the inauguration and execution of a prorate program by official administrative agencies of the state—the Agricultural Prorate Commission and the Proration Program Committee —acting not primarily for the benefit of the individual contributors to the stabilization pool, but ''in the interest of the public welfare and general prosperity of the State'' for the purpose of preserving the agricultural wealth of the state. (Agricultural Prorate Act, § 1.) Consistent with the legislative declaration of the dominant purpose of the act, passed under the police power of the state (*Agricultural Prorate Commission of California* v. *Superior Ct.*, 5 Cal.2d 550, 574 [55 P.2d 495]), is the following observation of the Supreme Court of the United States in *Parker* v. *Brown, supra,* 317 U.S. 350: ''. . . it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command.''

The surplus production for the 1938 marketing season—20 per cent of the crop—constituted a menace to the entire raisin industry and to the welfare of the state. (*cf. Parker* v. *Brown, supra,* at p. 367.) To remove such demoralizing factor from the market and to make possible the realization of a price for the ''free'' raisins which would amount to a fair economic return for the entire crop, the act set up certain machinery for divesting the growers of control of the prescribed surplus and vesting it in the program committee. Individual rights in the stabilization pool raisins were superseded by and subordinated to the public interest; the growers retained only such rights in the pooled raisins as the act specifically allowed to them—an accounting as to net profits, *if any,* realized on the disposition of the surplus commodity. Complete control and plenary discretion were conferred upon the program committee to handle the pooled raisins in such manner as to effect economic stability in the market for the season's crop; limited rights to the extent noted remained with the growers as to the contributed surplus. As so empowered, the program committee here in good faith negotiated the financial arrangement with the Commodity Credit Corporation to ''save the industry from destruction from ruth-

less competition, the direct effect of overproduction" (*Agricultural Prorate Commission of California v. Superior Ct., supra,* at p. 582), the Raisin Proration Association acted as the intermediary in effecting the consummation of the pledge agreement with the federal agency, and the entire marketing program unquestionably was promulgated in strict compliance with the procedural requirements of the act. In pursuance of the statute's express requirement that the surplus of the prorated commodity "not be marketed in any form which would directly compete with that part of the crop which is regularly certificated [the 'free' part]" (§ 19.1 (a)), the pledge agreement provided that the Commodity Credit Corporation in its sale of the pledged raisins "on such terms and for such prices as" it "may deem fair" was *"subject to the same restrictions as if such raisins were sold or otherwise disposed of by the* [Program] *Committee or the* [Raisin Proration] *Association."* (Italics added.) It reasonably appears from the record herein that the plan of financial relief for the 1938 marketing season inured to the benefit of *all* growers in the zone—non-borrowers and borrowers alike from the fund provided by the Commodity Credit Corporation—by fixing as a minimum price per ton for the marketing of the "free" crops an amount considerably higher than would have been obtainable in an unregulated and unsupported market. From this aspect as to the substantial advantages gained by *all* growers in consequence of the "bottom" placed under the raisin market incident to the availability of "non-recourse" loans to producers desiring such financial aid, it is plain that as a practical matter the integrated marketing program resulted only in a loss to the Commodity Credit Corporation by reason of its loan advancements.

However, the plaintiff argues that since the act does not specifically grant to the zone and its program committee the power to hypothecate the stabilization pool raisins in consummating a marketing plan, the pledge agreement here involved must be deemed an unauthorized proceeding. Such reasoning is wholly irreconcilable with the purport of the remedial statute in question—an act "to be interpreted with that degree of liberality which is essential to the attainment of the end in view." (*Agricultural Prorate Commission of California v. Superior Ct., supra,* at p. 577.) As we said by the Supreme Court of the United States in *Parker v. Brown, supra,* p. 346: "The California Agricultural Prorate Act

authorizes the establishment, through action of state officials, of programs for the marketing of agricultural commodities produced in the state, *so as to restrict competition among the growers and maintain prices. . . ."* (Italics added.) To effect the legislative intent to provide a statutory plan for insuring price stability in agricultural markets in the state, the program committee was expressly empowered to turn over the surplus to "charitable organizations, self-help cooperatives, and similar agencies" (§ 19.1(a)); to "create, establish . . . and operate facilities for the . . . disposal of such surplus in such manner as to maintain stability in the markets" (§ 19.1(b)); and to "collaborate and cooperate with agencies . . . of the United States, in the formulation and execution of a common marketing program" (§ 19.1(d)). Assuredly, where authorized even to make an outright *gift* of surplus raisins to insure a fair and equitable minimum price for the marketable crop, the program committee must be deemed for a like purpose to have authority to conclude a possibly less profitless arrangement from the standpoint of the contributing growers—the negotiation through a nonprofit organization (Raisin Proration Association) of a *pledge agreement* of surplus raisins in return for the cooperation of a federal agency (Commodity Credit Corporation) in financing pool operations and making available advances to growers desirous of such aid. ■ The Legislature clearly set forth the purpose of the act, and enacted a ground plan or design for its accomplishment; the implemental portions of the act must be construed so as to achieve its object. (*cf.* Max Radin's Article, *"A Short Way With Statutes,"* 56 Harv. L. Rev. 388, 407; 3 Sutherland on Statutory Construction, 3d ed., Horack, § 5402, p. 19.) ■ It is well settled in this state that governmental officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as *may fairly be implied* from the statute granting the powers. (23 Cal.Jur. § 117, p. 739; *Crawford* v. *Imperial Irrigation Dist.*, 200 Cal. 318 [253 P. 726]; *County of Los Angeles* v. *Graves*, 210 Cal. 21 [290 P. 444]; *Smith* v. *State Board of Control*, 215 Cal. 421 [10 P.2d 736]; *Southern Pacific R. R. Co.* v. *Stibbens*, 103 Cal.App. 664 [285 P. 374].)

In *Crawford* v. *Imperial Irrigation Dist., supra,* a problem in statutory interpretation similar to that here involved was presented. There the district employed a representative to appear before Congress in support of federal legislation in

which it was interested. The statute under which the district was created endowed its directors with broad powers to provide water for the use of landowners and inhabitants of the district but did not specifically authorize the employment in question. The plaintiff brought suit to enjoin the payment of compensation to the district's representative on the ground that the district had no power to expend funds for such employment. In holding that the district had such power under the broad and comprehensive nature of the legislation involved, this court said at page 330: "To withhold such authority . . . would be to cripple unnecessarily the power of the district to accomplish the purposes of its formation, and might seriously hamper the district in its efforts to secure the very contracts which the statute expressly authorizes it to make and execute with the United States government."

Upon analogous considerations as to the implications and intendments of the Agricultural Prorate Act, the conclusion is inescapable that consistent with its conferment of the above-quoted broad powers upon the program committee of a prorate zone in effecting the disposition of the surplus portion of a crop so as to insure market stability, the Legislature intended such committee to have authority to negotiate a pledge agreement as is here in question. The plaintiff's interpretation of the act would restrict the program committee's control of the stabilization pool raisins to the single power to make a gift of them to charity. Manifestly in construing the type of progressive social legislation here involved, the express grant is intended not to limit, but to mark the latitude of power vested in the program committee to achieve the declared purpose of the act. (§ 1.) To hold otherwise would be to nullify the essence of the statute by subordinating its purpose to a supposed limitation of its implemental terms. In such circumstances the maxim *"expressio unius est exclusio alterius"* and other rules of construction have no application. Those rules will not be utilized to contradict or vary a clear expression of legislative intent in a matter of such vital concern to the people of the state. (23 Cal.Jur. § 118, p. 740; *Blevins* v. *Mullally*, 22 Cal.App. 519, 529 [135 P. 307]; *Gallagher* v. *Campodonico*, 121 Cal.App.Supp. 765, 774 [5 P.2d 486]; *Sobey* v. *Molony*, 40 Cal.App.2d 381, 389 [104 P.2d 868].) The act is a recognition of the need for the establishment of adequate marketing programs for the preservation of economic standards in agricultural produc-

tion in the state. It does not attempt to provide all the details for the negotiation of a particular marketing plan, but its aim is to declare the sound principles on which the legislation was premised and to prescribe in comprehensive language the general powers of the administrative agency (the program committee) charged with the duty of achieving the desired result. ■ Such statute is to be construed in a way which will render its reasonable, fair and harmonious with its manifest purpose, and which will avoid mischievous or absurd consequences. (*Uhl* v. *Badaracco,* 199 Cal. 270, 284 [248 P. 917]; *County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634, 639 [122 P.2d 526].) "Therefore," as was said in *People* v. *Merrill,* 24 Cal.App. 206, 210 [140 P. 1075], "when a suggested construction of a statute in any given case necessarily involves a decided departure from what may be fairly said to be the plain purpose of the enactment, such construction will not be adopted to the exclusion of a possible, plausible interpretation which will promote and put in operation the legislative intent."

As above stated, the fund advancement by the Commodity Credit Corporation *conditioned* upon the pledge of the stabilization pool raisins in aid of the 1938 raisin marketing program, inured to the advantage of, and conferred a valuable privilege upon, *all* growers in the zone by guaranteeing for the benefit of all an economically fair minimum price for their marketable crop. The entire program was indisputably negotiated in complete good faith by the agencies concerned to prevent "agricultural waste" and to preserve for all raisin producers an equality of opportunity in the available markets "in the interest of the public welfare and general prosperity of the State." (Agricultural Prorate Act, § 1.) The record in this case shows that without the power to hypothecate the surplus prorated raisin crop, the program committee would have been unable to secure the necessary financial cooperation of the Commodity Credit Corporation to avert the acute economic crisis then facing the entire raisin industry—conditions would have been chaotic, producers unable to meet their financial obligations would have "dumped" their crops as they had done in previous years, and prices would have declined drastically to levels below the cost of production. In short, the very situation which the Agricultural Prorate Act was designed and enacted to prevent would have inevitably come to pass. Under such circumstances it is but reasonable to assume that the Legisla-

ture intended that implicit within the scope of the broad powers conferred upon the program committee of a zone was such agency's authority to arrange for the *pledge* of surplus production as the demands of the particular situation existing in the regulated agricultural industry might require—*here* (1) as security for loans to cover expenses incurred in the handling and storage of the pooled raisins and (2) as additional collateral for non-recourse loans on "free" crops made available to all producers desiring such financial assistance. To hold otherwise would be to succumb to the "tyranny of words" in derogation of the clear purpose of the act.

That the plaintiff did not choose to avail himself of the financial aid proffered in connection with the 1938 raisin prorate program does not invalidate any part of the integrated marketing plan as to him. His status as a non-borrower was a matter for his *private* determination, but the program committee's pledge of the stabilization pool raisins —those contributed by borrowers and non-borrowers alike —was an exercise of its authority to control the disposition of the *excessive* production for the benefit of the *entire* industry, and as such was of vital concern to the state. As heretofore stated, the Agricultural Prorate Act was passed under the police power of the state to promote the general welfare. From such standpoint the individual grower's rights in the *surplus* raisin crop were subjected to the paramount rights of the public, and the Legislature's flexible plan for the regulation of "agricultural waste" as a matter "affected with a public interest" was manifestly intended to be binding equally upon *all* producers regardless of any extraneous private decisions open to them under the general program promulgated for the preservation of the industry. (*Agricultural Prorate Commission of California* v. *Superior Ct., supra,* at pp. 574-584.) Accordingly, insofar as is concerned the operative force of the pledge agreement and loan transaction as essential parts of the 1938 raisin prorate program, the plaintiff's position as a non-borrower is no different from that of the borrower—neither may complain of the program committee's undertaking in pursuance of legislative mandate.

In view of the foregoing discussion of the merits of this case, sustaining the validity of the challenged pledge agreement, the other points of dispute raised by the parties in their pleadings, as noted in the fore part of this opinion,

need not be considered. The plaintiff has failed to state a cause of action here, and the judgment is reversed with directions to the trial court to enter a judgment dismissing the complaint.

Gibson, C. J., Shenk, J., and Traynor, J., concurred.

SCHAUER, J.—I dissent from the order directing the trial court to dismiss the action.

The holding of the majority opinion depends essentially upon the premise that the program committee and the Raisin Proration Association were authorized by the Agricultural Prorate Act (Deering's Gen. Laws, 1937, Act 143a) to pledge surplus-pooled raisins of non-borrowing growers as security for *non-recourse* loans made to borrowing growers, and, upon default in repayment of the loans, to sell such surplus-pooled raisins of non-borrowers for the account of the borrowers. A necessary subsidiary premise of the majority opinion is that the net loss from the defaulted loans was a proper item of cost of operation of the program and that the pledge and sale of the surplus-pooled raisins was a proper method of providing funds to cover such costs. Neither premise is sound.

Discussing the last mentioned premise first, and conceding only for the purpose of this argument that the net loss from defaulted loans was a proper item of cost of operation, it appears that the method used (the pledge and sale of surplus-pooled raisins) to obtain funds to cover such item is directly violative of express provisions of the act. As to the spread of costs of operation the concluding provision of section 19.1 of the act requires that ''The cost of the exercise of such powers as are herein granted to the program committee shall be a part of the cost of the operation of the program and *shall be obtained through fees in the same manner as other costs of the program.*'' (Italics added.) The ''other costs of the program'' are provided for in sections 20 and 21. Section 20 sets up a system of controlling the quantities of the commodity which individual growers are entitled to produce, and the volume and time of harvesting thereof, through the issuance of ''Proration Certificates.'' Section 21 provides that ''The agent under each zone program shall collect for each certificate issued to the producers, a reasonable and proportional fee to be fixed by the program committee so calculated as to produce the expenses of the administration of the program, the costs of the institution of the program, and a proper pro-

portion of the cost of the maintenance of the commission. . . ."

It cannot be successfully contended that the program committee has authority to collect costs of operation otherwise than through such fees because, it will be remembered, section 19.1 specifically ordains that "The cost of the exercise of *such powers as are herein granted to the program committee* shall be a part of the cost of the operation of the program and *shall be obtained through fees in the same manner as other costs of the program.*" (Italics added.) Certainly the phrase "such powers as are herein granted to the program committee" is inclusive of *all* powers granted to it.

Returning to the first mentioned premise—that the program committee and the Raisin Proration Association were authorized by the act to pledge surplus-pooled raisins of non-borrowing growers as security for non-recourse loans made to borrowing growers, and, upon default in repayment of the loans, to sell such surplus-pooled raisins of the non-borrowers for the account of the borrowers—we find that the act not only fails to confer such authority expressly but that it impliedly negatives any such power. The Raisin Proration Association had no powers, material here, not possessed by the program committee. The plan of the act vests the management of the marketing program in the committee. Section 19.1 of the act specifically and exclusively enumerates the powers of that committee.

The section under discussion expressly declares that "The program committee, for the purpose of minimizing the effect of existing surpluses upon market conditions, shall be empowered *in any or all of the following particulars:*" (italics added), and then follows the enumeration of those particulars. This statute is *creative* and in such a case it is an unquestioned rule of construction that the enumeration of certain powers is exclusive of all others. (23 Cal.Jur. 740, § 118; 2 Sutherland, Statutory Construction (Horack's ed. 1943) 414, § 4915; *San Joaquin etc. Irr. Co.* v. *Stevinson* (1912), 164 Cal. 221, 234 [128 P. 924]; *Gruben* v. *Leebrick & Fisher* (1938), 32 Cal.App.2d Supp. 762, 765 [84 P.2d 1078]; see, also, *Johnston* v. *Baker* (1914), 167 Cal. 260, 264-265 [139 P. 86]; *Moore* v. *Webb* (1933), 219 Cal. 304, 309 [26 P.2d 22, 89 A.L.R. 925]; *In re Peart* (1935), 5 Cal.App.2d 469, 472 [43 P.2d 334]; *Brintle* v. *Board of Education* (1941), 43 Cal.App.2d 84, 87 [110 P.2d 440].) Moreover, the act directs that "Each producer delivering his surplus to a pool shall be credited for

his proportionate share of the surplus so delivered'' and that ''The program committee shall handle all commodities received by a surplus pool and account for the same *on a pooled basis.''* (Italics added.) Likewise suggesting the same conclusion is the expressly enumerated power '' (f) To create, maintain and disburse *an equalization fund* to be used for the removal of any inequalities between producers as to the total volume marketed through prorated channels resulting from errors in estimating production or surplus.'' (Italics added.)

As previously mentioned, nowhere in the act is the program committee or other agency expressly authorized to hypothecate (or sell) the pooled surplus of one grower as security for (or for repayment of) non-recourse loans to another. The absence of such authorization, in the light of the doctrine *expressio unius est exclusio alterius,* as illustrated and applied in the above cited cases, in itself precludes our interpolating it into the statute. But beyond the mere absence of such authorization the act avows a plan and purpose which might well be defeated by the making of such pledge. As an express proviso to the grant of the power to the program committee ''To establish and maintain surplus pools,'' the act declares, ''provided, however, such surplus shall not be marketed in any form which would directly compete with that part of the crop which is regularly certificated; and provided, further, that any part of any such surplus may be turned over by a program committee to charitable organizations, self-help cooperatives, and similar agencies *under proper safeguards* to prevent any part of the commodity so disposed of from directly competing with the part of the crop marketed through the usual channels of trade.'' (Italics added.) In the light of the scrupulous care and particularization shown by the Legislature in limiting the power of the committee relative to disposal of the surplus so as to guard against adversely affecting the market for the free crop, it is not reasonable to assume that in the same act the Legislature intended to give the committee unbridled power to hypothecate that surplus *and so subject it to the possibility of forced sale in direct competition with the free crop.* The mere fact that in this case the program committee secured from the pledgee an agreement that in selling under the pledge it would respect the limitations placed by the act on the committee does not seem to me to satisfactorily bridge the legislative gap. If the Legislature had intended that the com-

mittee have the mooted power would it not have specified that power and stated requirements for proper safeguards attending the exercise thereof as it did in respect to transfers to charitable organizations? If the committee had the power to make the pledge did it have to exact any safeguards? The act does not so provide. If not, could this power not result in substantial defeat of the purpose of the act?

I agree with the majority statement that the primary purpose of the act "is to eliminate 'the unnecessary and unreasonable waste of agricultural wealth' and to insure to agricultural producers a fair financial return on their crops 'in the interest of the public welfare and general prosperity of the State'" and that "Equally plain is the Act's contemplation that its purpose would be accomplished by marketing programs which would minimize the 'effect of existing surpluses upon market conditions' and which would provide for the 'disposal of such surplus in such manner as to maintain stability in the markets'" but I cannot subscribe to the further declaration that "The pledge of the stabilization pool raisins [of non-borrowing growers as security for non-recourse loans to borrowers] was an essential and integral part of the financing plan to withhold the prescribed surplus from the season's market so as not to glut it and crowd down prices to a point below the cost of production." Nor can I agree that the costs of operation of the program could be recouped lawfully by sale of the pooled raisins of non-borrowers.

In my view the opinion of the District Court of Appeal (Fourth Appellate District) prepared by Mr. Justice Marks (reported in 140 P.2d 53) properly disposes of this appeal and I refer to it for treatment of the other points argued.

The judgment should be reversed and the cause remanded to the trial court with directions to permit the parties to file amended pleadings if they be so advised.

Edmonds, J., and Carter J., concurred.

Respondent's petition for a rehearing was denied September 28, 1944. Edmonds, J., Carter, J., and Schauer, J., voted for a rehearing.